Brenda DOBRATZ, Personally and as Special Administrator of the Estate of her deceased husband, Mark Dobratz, Plaintiffs-Respondents-Cross Appellants-Petitioners,

v.

Gregg THOMSON, State Farm Fire & Casualty Company, Ron Abraham, West Bend Mutual Insurance Company, James C. Cooney, Transamerica Insurance Company, Thomas Smith, State Farm Fire & Casualty Company, Jeff Thomson, Brian Hahn and Sheboygan Falls Mutual Insurance Company, Defendants-Appellants-Cross Respondents,

BLUE CROSS/BLUE SHIELD UNITED OF WISCONSIN, Defendant.

Supreme Court

*No. 88–2320. Argued February 26, 1991.—Decided May 1, 1991.*

(Also reported in 468 N.W.2d 654.)

For the plaintiffs-respondents-cross appellants-petitioners there were briefs by *John E. Shannon, Jr., Russell T. Golla* and *Anderson, Shannon, O'Brien, Rice & Bertz,* Stevens Point and oral argument by *Mr. Golla.*

For the defendants-appellants-cross respondents there was a brief by *Michael S. Siddall* and *Herrling, Clark, Hartzheim & Siddall, Ltd.,* Appleton and oral argument by *Michael S. Siddall.*

STEINMETZ, J.   There are two issues in this case. The first is whether the exculpatory contract at

issue here is void and unenforceable as contrary to public policy. The second issue is, if the exculpatory contract is not void and unenforceable as contrary to public policy, are its terms nevertheless so unclear and ambiguous as to render the contract unenforceable as a matter of law.

This is a summary judgment case arising out of events that caused the death of Mark Dobratz. He died from injuries he suffered in a waterski show sponsored and performed at no charge for the general public by Webfooter Water Shows, Inc. ("Webfooter" or "the club"), a nonprofit corporation operating as a waterski club. Mark Dobratz was skiing in the show, on July 3, 1985, as a member of Webfooter, which he had officially joined in either December 1984 or January 1985. The director of the show described him as a "beginner" waterskier.

The record indicates that Webfooter's 1985 season included giving two shows a week as well as participating in state and national tournaments, starting in early June and ending in early September of that year. These shows and tournaments were to take place at at least seven different locations in Wisconsin. The record indicates that audience members were always admitted free of charge.

The July 3, 1985, show, conducted at Fremont, Wisconsin, on the Wolf River, included an opening series of stunts which, taken as a whole, the club allegedly had not previously performed for an audience, although the club members apparently had practiced individually the several stunts comprising the series. The series, which was later described as "very dangerous" by at least one club member, involved six club skiers being towed by a single boat who were to discard their skis and continue skiing barefoot. Those skiers, continuing to ski, were to be met and passed in part of the "stage" area by a second

507

boat and ten club skiers approaching from the opposite direction. As they were being towed by the first boat, Mark Dobratz and the other skiers attempting the barefoot maneuver failed in the stunt and fell into the water. Although the driver of the approaching second boat was aware that skiers from the first boat had fallen, he continued to drive the boat into the "stage" area. The boat struck and injured Mark, who was still in the water. He died a few hours later.

Mark Dobratz's widow, Brenda Dobratz, both as personal representative of her husband's estate and in her own capacity, filed suit in a timely manner in the circuit court for Waupaca county. Her suit named club officers and various club members who participated in the show and alleged causal negligence on their part. She also sued the driver of the second boat, Gregg Thomson, alleging causal negligence and reckless conduct on his part. Specifically, she asserted three causes of action: (1) a claim for wrongful death under secs. 895.03 and 895.04, Stats.; (2) a claim for conscious pain and suffering under sec. 895.01; and (3) a claim for loss of consortium experienced by her after the collision and prior to her husband's death. Webfooter itself was not named in the suit, and, because the club did not carry any applicable insurance, no Webfooter insurance carrier could be named in the suit. However, the individual defendants' personal or homeowner's liability policies covered liability for damages caused by any negligence on their part, and those insurers were joined as parties.

Both sides moved for summary judgment, the defendants seeking dismissal of the action on grounds that Mark Dobratz, by signing the exculpatory contract, had released all of the defendants from liability for negligence in connection with the show. Brenda Dobratz, on

the other hand, sought a ruling that the exculpatory contract was invalid on public policy and other grounds.

Brenda Dobratz submitted an affidavit of Jeff Thomson, Webfooter's president, and the testimony from the deposition of Bryan Hahn, the director of the waterski show, portions of which relate at least indirectly to Mark's receiving and signing the contract. In his affidavit, Jeff Thomson stated that "[a]ll club members, as well as Mark Dobratz, fully understood that the reason for this release was because of the club's lack of insurance coverage for injuries caused to show participants or club members caused by the club or other participants or club members." In his deposition, Hahn stated that it was his practice "to explain [the release] to everybody before they sign it . . . and we normally, when we hand it out, say the reason we have a release is because of our insurance, because of the bind with the insurance."

The circuit court, the Honorable Philip M. Kirk, Judge, rejected the parties' respective motions for summary judgment. In denying the motions from the bench, the court stated that there existed genuine issues of material fact. Specifically, the court stated that there was an important dispute as to the number of times that the ill-fated water show "stunt" had been practiced prior to the accident. The court also found that there was an issue of fact as to whether the parties, when they signed the release, contemplated the type of "stunt" that was performed and the risks associated with performing it. The defendants appealed and Brenda Dobratz cross-appealed.

The court of appeals issued a decision which it subsequently vacated on its own motion. Then, in *Dobratz v. Thomson,* 155 Wis. 2d 307, 455 N.W.2d 639 (1990), the court of appeals determined that the exculpatory

contract was not contrary to public policy or void on any other ground. Thus, the court of appeals concluded the contract was enforceable. The court of appeals held as a matter of law that Brenda Dobratz's action was barred in all respects except for her claim for lack of consortium and any claim based on reckless conduct by Gregg Thomson as driver of the boat that struck Mark Dobratz. Thus, affirming in part and reversing in part the trial court's order, the court of appeals remanded the case for further proceedings. Brenda Dobratz petitioned for review.

Sometime after joining Webfooter, Mark signed an exculpatory contract with the club.[1] The precise circumstances as to how and when Mark received the exculpatory contract are not clear from the record. However, the record indicates that Van Lyssel, Webfooter's membership chairman, handed out a copy of the same contract

[1] By definition, an exculpatory contract is a contract that would seek to release one or more of its parties from at least some liability resulting from any negligent act or omission or other wrongful act by that party. *Merten v. Nathan,* 108 Wis. 2d 205, 210, 321 N.W.2d 173 (1982); *accord Discount Fabric House v. Wis. Tel. Co.,* 117 Wis. 2d 587, 590, 345 N.W.2d 417 (1984) ("exculpatory" means "tendency to clear from a charge of fault or guilt").

The photocopy of the exculpatory contract that is contained in the record indicates a one-page document that at top has a typed heading that reads "WEBFOOTER WATER SHOWS INC." immediately followed on the same line by a partially typed and partially handwritten notation "1985" that obviously refers to the year 1985. Specifically, the "5" of "1985" is handwritten, while all the other numerals of the notation are typewritten. Evidently, the purpose of the handwritten "5" was to cover up and render indecipherable a typed numeral that would have been part of a reference to a year other than 1985, which it did.

Below the heading, the contract reads as follows:

to each club member. It also indicates that Lyssel told club members that the contract constituted a "release" that each of them should read and sign. The record indi-

SKIER
Name:   Mark Dobratz
Address:   . . . .
Phone:   . . . .

Parent or Guardian
Name:
Address:
Phone:

Doctor or Physician
Name:   Dr. Peterson
Address:   Waupaca Family Medicine Assoc.
Phone:   None

I, hereby release, and agree to hold harmless the Webfooter Water Shows Inc., the promoters, the owners and lessees of the premises, the participants, and the officers, directors, officials, representatives, agents and employees of all of them, of any and from all liability, loss, claims, and demands that may accrue from any loss, damage or injury (including death) to my person or property, in any way resulting from, or arising in connection with this event, and whether arising while engaged in competition or in practice or preparation therefore, or while upon, entering or departing from said premises, from any cause whatsoever. I know the risk and danger to myself and property while upon said premises or while participating or assisting in this event, so voluntarily and in reliance, upon my own judgment and ability, and I thereby assume all risk for loss, damage or injury (including death) to myself and my property from any cause whatsoever.

I hereby agree to abide by all bylaws in conjunction with and set up by the Webfooter Water Shows Inc.

This is a Release.
Signed    Mark Dobratz

cates that this took place in either January or February 1985 or at a club meeting in April 1985. The record does not indicate that any club member personally discussed with Mark Dobratz any legal significance attaching to one's signing such a contract.

Although the date that Mark Dobratz signed the contract is not indicated anywhere in the record, it is clear that each club member, including Mark, was required to sign the contract before participating in any Webfooter practices or shows, whether on land during winter and spring or on water beginning in late May 1985. The record does clearly indicate that Mark Dobratz signed the contract well before the start of the 1985 show and tournament season. It is averred and uncontroverted that when Mark Dobratz signed the contract, neither he nor anyone else knew or could predict any particular show "stunt" in which he eventually might participate during the 1985 season.

\* \* \*

■

There is a standard methodology which a trial court follows when faced with a motion for summary judgment. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 314, 401 N.W.2d 816 (1987), *citing Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980). The first step of that methodology requires the court to examine the pleadings to determine whether a claim for relief has been stated and a material issue of fact presented. *Grams,* 97 Wis. 2d at 338. If a claim for relief has been stated, the inquiry then shifts to the moving party's

---

There is no designated place on the document for Mark Dobratz to have indicated the date of his signing; the date of his signing is not indicated at all on the document.

affidavits or other proof to determine whether the moving party has made a *prima facie* case for summary judgment under sec. 802.08, Stats. *Id.* To make a *prima facie* case for summary judgment, a moving defendant must show a defense which would defeat the plaintiff. *Id.* If the moving party has made a *prima facie* case for summary judgment, the court must examine the affidavits and other proof of the opposing party to determine whether there exist disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a trial. *Id.* Under sec. 802.08(2), Stats., summary judgment must be entered:

> 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'

*Green Spring Farms,* 136 Wis. 2d at 315.

When reviewing the grant of a summary judgment motion, we are required to apply the standards set forth in sec. 802.08, Stats., just as the trial court was to apply those standards. *Id.* When testing the sufficiency of a complaint, we take all facts pleaded by the plaintiff and all inferences which can reasonably be derived from those facts as true. *Id.* at 317. "Pleadings are to be liberally construed, with a view toward substantial justice to the parties. Section 802.02(6). The complaint should be dismissed as legally insufficient only if it is quite clear that under no circumstances can plaintiffs recover." *Id.*

Applying the summary judgment methodology to the defendants' motion, it is clear that Brenda Dobratz

has stated a cause of action against each defendant. In denying those charges on the basis of the exculpatory contract as well as on their merits, the defendants have stated a *prima facie* case for summary judgment. Thus, it is necessary to examine the affidavits and other proof offered to determine whether there exists any disputed material fact or undisputed material fact from which reasonable alternative inferences might be drawn and which would be sufficient to entitle Brenda Dobratz to a trial.

As a preliminary matter, Brenda Dobratz submits that the exculpatory contract is void and unenforceable as contrary to public policy. It follows, she says, that the defendants' motion for summary judgment must be denied insofar as there remains a disputable material fact or inference arising from such a fact.

Generally, the law does not favor an exculpatory contract. *Arnold v. Shawano County Agr. Society,* 111 Wis. 2d 203, 330 N.W.2d 773 (1983), *overruled on other grounds, Green Springs Farms,* 136 Wis. 2d 304, 317. This is so because exculpatory contracts tend to allow conduct in the given area of activity or pursuit which conduct is below the acceptable standard of ordinary and reasonable care applicable to that activity or pursuit. However, exculpatory contracts are not "automatically" void and unenforceable as contrary to public policy. *College Mobile Home Park & Sales v. Hoffmann,* 72 Wis. 2d 514, 519, 241 N.W.2d 174 (1976). A determination as to whether an exculpatory contract is void and unenforceable as contrary to public policy requires the court to look at the particular facts and circumstances of the case. *Id.* at 519-20. As we elaborated in *Merten v. Nathan,* 108 Wis. 2d 205, 211-12, 321 N.W.2d 173 (1982), such a determination involves accommodating

the tension between principles of contract law and tort law inherent in any exculpatory contract.

In *Arnold,* we determined that the exculpatory contract there was not void and unenforceable as contrary to public policy. The case involved a stock car race at a county race track. Each of the drivers in the race was required to enter into an exculpatory contract whereby he agreed not to hold liable the race promoter, the racing association, the track operator, the track owner, the landowner, and any other drivers in the race for any injury arising out of the race. The plaintiff, a driver in the race, sustained severe brain damage when, after crashing through the guardrail lining the racetrack, racetrack rescue personnel sprayed chemicals into his burning car, causing a chemical reaction that made the fumes extremely toxic.

Like Brenda Dobratz, the plaintiff in *Arnold* alleged both that the exculpatory contract at issue was unenforceable as contrary to public policy and also that the contract was so unclear and ambiguous as to render it meaningless as a matter of law for purposes of that case. In reaching the determination that the contract was not contrary to public policy, we referred with approval to sec. 195 of the Restatement (Second) of Contracts (1979). *Arnold,* 111 Wis. 2d at 210–11. Section 195 lists the following situations in which exculpatory contracts are unenforceable on grounds of public policy:

'(1) A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.

'(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if

'(a)   the term exempts an employer from liability to an employee for injury in the course of his employment;

'(b)   the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or

'(c)   the other party is similarly a member of a class protected against the class to which the first party belongs.

'(3)   A term exempting a seller of a product from his special tort liability for physical harm to a user or consumer is unenforceable on grounds of public policy unless the term is fairly bargained for and is consistent with the policy underlying that liability.'

Section 195, Restatement (Second) of Contracts (1979). None of the situations listed in sec. 195 being present in *Arnold,* we did not regard the exculpatory contract as unenforceable on the basis of public policy.

As in *Arnold,* none of the situations listed in sec. 195 is present in the instant case. However, as we noted in *Merten,* in addition to those situations listed by sec. 195, there are other situations, not necessarily previously listed as such, in which exculpatory contracts are void and unenforceable because public policy so requires. *See Merten,* 108 Wis. 2d at 213.[2]

In *Merten,* the plaintiff brought an action for injuries she sustained while taking horseback-riding lessons from Burgundy Ridge Farms, Inc. The plaintiff had

---

[2]Subsequent to *Merten,* we have discussed certain of these situations to which it alluded. *See e.g., Discount Fabric House,* 117 Wis. 2d 587, 600 (exculpatory contract held contrary to public policy where parties not on equal bargaining terms and an important public interest involved).

516

signed an exculpatory contract that purported to relieve the defendants from liability arising from injuries incurred by the plaintiff during riding lessons. A key provision in the contract expressly said that Burgundy Ridge Farms, Inc., and its owners or operators, had no liability insurance coverage for any injuries resulting from the riding lessons. After she was injured, the plaintiff learned that, contrary to the representation in the contract, Burgundy Ridge Farms, Inc., did have a liability insurance policy which covered her injuries.

Thus, an actual misrepresentation[3] took place in *Merten*. That misrepresentation, contained within the very document setting forth the exculpatory contract, went to "the essence of the contract, that is, the how and why the risks of loss [were] to be shifted from the prospective negligent actor[s] to the victim." *Id.* at 213. Under such circumstances, "the principles of contract law do not weigh heavily in favor of enforcement of the exculpatory contract, and the goals of tort law weigh against enforcement of the exculpatory contract." *Id.* at 214. Enforcement of such a contract would "open the door to sharp practice" and "raise the strong suspicion of inequitable motive and overreaching and of lack of good faith or fair dealing on the part of the party seeking the release and the oppression of the party executing the release." *Id.* Even if such a misrepresentation as that which occurred took place "innocently," it would be unjust to allow the maker of the misrepresentation to retain the fruits of a bargain induced thereby. *Id.* at 209–210 n.2. Accordingly, the court held the contract

---

[3]In *Merten*, the court described what took place as, synonymously, a "misrepresentation," a "misstatement," and a "false explanation." For purposes of this case, we will use only the word "misrepresentation," which word has the same meaning here as it had in *Merten*.

void and unenforceable as contrary to public policy. *Id.* at 215.

Brenda Dobratz submits that the situation that was present in *Merten* is similarly present here. Specifically, insofar as each of the named Webfooter defendants had coverage under some individual liability insurance policy, Brenda Dobratz claims that Jeff Thomson's and Hahn's statements as to a lack of insurance coverage indicated a misrepresentation requiring that the exculpatory contract be rendered void and unenforceable as contrary to public policy. That is, she argues that the statements related in part to the individual club members' insurance status and not only to the insurance status of the club as such. We disagree.

There was no misrepresentation here as there was in *Merten.* As the court of appeals correctly implied, the statements of Jeff Thomson and Hahn upon which Brenda Dobratz relies related solely to information conveyed to Mark Dobratz about the fact that Webfooter as a club had no applicable liability insurance coverage. Those statements, referring to "the club's lack of insurance" and "our insurance . . . the bind with the insurance," clearly did not relate in any way to insurance status of the individual members of the club as such. Indeed, our review of the record indicates that there was absolutely no representation, let alone any misrepresentation, as to whether the individual club members did or did not have applicable liability insurance coverage. Given that the club did not have any applicable insurance coverage, the information reflected in the statements of Jeff Thomson and Hahn and conveyed to Mark Dobratz was thus completely truthful. Brenda Dobratz has not shown any misrepresentation that went to the

518

"essence of the contract."[4]

There having been no misrepresentation here, *Merten* is not controlling. Moreover, Brenda Dobratz has not carried her burden of showing that there exists any of the other "situations" to which we alluded in *Merten* or which we have discussed in other case law.[5] Accordingly, and also in light of our conclusion that none of the pertinent "situations" listed in sec. 195 of the Restatement (Second) of Contracts is present here, we hold that

[4]This court's conclusion is supported by a practical look at the "essence" of this contract. Specifically, the exculpatory contract had a character of mandatory mutuality: each club member was required to sign the contract in order to participate in the club, and by doing so was relieved of liability to every other club member. This character of mandatory mutuality was the "essence of the contract" as between the individual club members. Under these circumstances, it would seem fair to presume that most if not all of the individual members signed the contract for the most expedient of reasons, *i.e.,* in order to qualify to participate in club activities thereby. Others may have signed with some appreciation for the fact that, as a practical matter, the contract might save them from the "hassle" of defending a lawsuit. In any case, it seems unlikely that any representations would be made under such circumstances asserting that each and every one of the club's 20-plus members had absolutely no applicable insurance and it seems similarly unlikely that a reasonable signee would rely upon any such statements.

[5]Brenda has not relied here, as she did before the court of appeals, on *Wagenblast v. Odessa School,* No. 105-157-166J, 758 P.2d 968 (Wash. 1988). Specifically, the case is not helpful to Brenda's position insofar as the activity at issue in this case is not a subject "generally thought suitable for public regulation," or "a service of great importance to the public," and insofar as Webfooter did not have a "decisive advantage in bargaining strength." *Dobratz,* 155 Wis. 2d at 316, quoting *Wagenblast.*

the exculpatory contract is not void and unenforceable as contrary to public policy. In other words, this particular exculpatory contract is one in which it is appropriate to favor principles of contract law over principles of tort law. Thus, public policy does not prohibit us from granting the defendants' motion for summary judgment.

This raises the second issue. In *Arnold,* we indicated that where an exculpatory contract is not void and unenforceable on public policy grounds:

> We therefore must look to the contract itself to consider its validity. Specifically, we examine the facts and circumstances of [the] agreement to determine whether it expresses the intent of the parties with particularity. If the contract fails to do so, it will not be enforced.

*Arnold,* 111 Wis. 2d at 211. That is, this court must determine whether the claim being made by the plaintiff was clearly within the contemplation of the parties when the contract was executed. *Id.* at 211–12. Only if it is apparent that the parties, in light of all the circumstances, knowingly agreed to excuse the defendants from liability will the contract be enforceable. *Id.* at 213. This court will disfavor any exculpatory contract that is broad and general in its terms. *Id.* at 211. In making our ultimate determination, the court will closely scrutinize an exculpatory contract and construe it strictly against the defendants. *Arnold,* 111 Wis. 2d at 209; *Merten,* 108 Wis. 2d at 211.

Brenda Dobratz argues that the defendants' motion for summary judgment must be denied insofar as the terms of the exculpatory contract are so unclear and ambiguous as to render the contract unenforceable as a matter of law. If she is correct, it would not be appropri-

ate to grant the defendants' summary judgment motion insofar as there remain material issues of fact.

We noted in *Arnold* that the exculpatory contract there was "obviously a form release [that was] used throughout the United States for many automobile racing contests." *Id.,* at 211. Insofar as the contract "fail[ed] to set out any particular conditions concerning the nature of [the] race and the facility where it [was] to take place," we found the contract did not adequately "assure certainty to the parties involved." *Id.* "More significantly, [the contract] contain[ed] very broad and general provisions," stating that its provisions encompassed "all loss or damage and any claim or demands" whether caused by negligence or otherwise. *Id.* at 211–12. The court considered this language to contain ambiguities. *Id.* at 212. Specifically, the court said that:

> [w]hile it would [have been] reasonable to assume that this exculpatory contract was intended to preclude liability for such things as negligent maintenance of the track or the negligent driving of another driver participant, we [could] not conclude that this contract was meant to cover negligent rescue operations.

*Id.* That is, in effect, the exculpatory contract failed to express the intent of the parties with particularity. An issue of material fact existed as to whether the risk of negligent rescue operations was within the contemplation of the parties "at the time of the execution of the release." Accordingly, we ruled it was inappropriate to grant the motion for summary judgment; questions surrounding that contract were for the trier of fact. *Id.* at 212–13.

The contract at issue in this case was not a "form release" as was the contract in *Arnold.* Specifically,

521

nothing indicates that the contract was intended to be used across the country; unlike in *Arnold,* there was no provision stating that the contract was "intended to be as broad and inclusive as is permitted by the law of the state in which the [activity was] conducted." As in *Arnold,* however, particular provisions of the contract here are very broad and general.

Like the contract in *Arnold,* this contract did not "set out any particular conditions concerning the nature of [the activity] and the [location] where it [was] to take place." For example, it did not specifically indicate that the activity of skiing was included within its scope, although the record does make it clear that skiing was so included. More significantly, the contract did not indicate what particular sorts of skiing stunts Mark Dobratz might be asked to perform.[6] It did not specify what level of difficulty or dangerousness might have been associated with such stunts, and the record makes clear that no information whatsoever was provided to Mark Dobratz in this regard before he signed the contract. In fact, when Mark Dobratz signed the contract the stunts for the season had not been determined. Thus, when he signed the contract, Mark Dobratz could not have knowingly agreed to assume the risk of performing the ill-fated stunt on July 3, 1985. On this basis alone, we hold

_____

[6]Counsel for the defense indicated at oral argument that the exculpatory contract here covered any type of skiing stunt by a Webfooter member as such. Specifically, in response to questioning, he indicated that the contract would in effect cover a situation in which a Webfooter skier, as part of a show, were propelled out of a cannon, as a "human cannonball," in order to land on his skis, even though there is no indication whatsoever in the record that any such stunt was ever contemplated by the parties to the contract.

that the contract is unenforceable as a matter of law. In effect, as a matter of law, there never was any exculpatory contract for purposes of this case.

Because we hold as a matter of law that there could not have been an enforceable contract, this is not a case like *Arnold* where it became necessary for the trial court to determine whether in fact there existed an exculpatory contract even though we could not find an enforceable exculpatory contract as a matter of law.

Moreover, it is noteworthy that the contract referred only to an injury "in any way resulting from, or arising in connection with *this event,* and whether arising while engaged in *competition* or in *practice* or *preparation* therefore" (emphasis added). Nowhere are the words "this event" defined. The term itself suggests the possibility that the contract applied only to one particular act or episode of skiing, and there is no indication that it was intended to apply to any part of the ski show in question. A possible interpretation of the contract is that it was not even intended to apply to ski shows at all; the contract expressly speaks only in terms of "competition" or "practice" or "preparation therefore," but there is nothing in the contract that suggests that any ski show, or the July 3, 1985, show, in particular, was any of those things.

Even if the entire ski show in question, *i.e.,* "the event" were covered by the exculpatory contract, an important question follows from *Arnold.* Specifically, it is unclear whether the activities that took place immediately after Mark Dobratz fell into the water and up until the time he was hit were to be included within "the event," or whether, alternatively, they constituted something akin to the rescue operations in *Arnold* that were not clearly covered under the exculpatory contract there.

The exculpatory contract here did not cover being run over by a boat, let alone by the flag line boat. Such an accident might not have been one that "ordinarily and inevitably would occur." *See Gross v. Sweet,* 49 N.Y.2d 102, 400 N.E.2d 306, 310 (1979). As such, it could not have been within the contemplation of the parties to the exculpatory contract.

In addition, the exculpatory contract here did not refer specifically to the location of whatever activities it covered. In fact, the contract was to cover up to seven different potential sites during the year. The contract referred only to activities carried out "while upon, entering or departing from [the] premises." What the term "the premises" was intended to refer to is not defined in the contract or in the record. Conceivably, given a common understanding of "premises," it referred only to dry land; if that is so, the contract covered activities only on dry land. Even if the contract included activities on water, nothing in the contract specified that the Wolf River in particular was to be a locus of those activities. Given the different skiing conditions that one might expect on a location such as the Wolf River, particularly at Fremont, as compared with the conditions one might expect on a wider and larger river or on a lake, the contract should have included this information. The particular location or locations covered by the exculpatory contract should have been set forth expressly within it so as to express the intent of the parties with particularity.

Because it is clear that at least certain important matters were not within the contemplation of the parties at the time the contract was signed, this case is distinguished from *Trainor v. Aztalan Cycle Club, Inc.,* 147 Wis. 2d 107, 432 N.W.2d 626 (Ct. App. 1988).

In *Trainor,* a motorcycle racer was injured while participating in a "motocross" race on the race course of

the defendants. He sued for negligence in the maintenance of the race course and in the running of the race on a track the defendants allegedly knew to be dangerous. The defendants moved for summary judgment on the grounds that the plaintiff had executed several exculpatory contracts with the defendants prior to the race which contracts purported to relieve the defendants from any and all liability for negligence. It was undisputed that at least one of the releases was signed on the day before the race, shortly after the plaintiff had personally inspected the race course. In fact, the defendants had encouraged riders to personally inspect the track prior to the race. The plaintiff was injured while attempting to negotiate a jump which he specifically recognized as dangerous and as to which he unsuccessfully requested a design modification prior to signing the release. In light of these circumstances, and also given the fact that, unlike *Arnold* and the case at bar, the events giving rise to the injury in *Trainor* were clearly within the scope of "the event" described in the exculpatory contract, the court of appeals correctly held that summary judgment was properly granted. *Id.* at 117–18. The plaintiff clearly had assumed the risk of the injury caused by the negligence of others.

To have been valid and enforceable as a matter of law, the exculpatory contract here should have included most if not all of the information the lack of which here is manifest. Furthermore, although we do not intend to create a "magic words" rule, we consider that it would be very helpful for such contracts to set forth in clear and express terms that the party signing it is releasing others for their negligent acts or, where the contract includes an assumption of risk clause, is assuming the risk of harm caused by the negligent acts of others. *Cf. Ruppa v.*

*American States Ins. Co.,* 91 Wis. 2d 628, 637–38, 284 N.W.2d 318 (1979) (indemnity contracts will generally not be construed to cover losses caused by the indemnitee's own negligence unless such effect is clearly and unequivocally expressed in the agreement).

While we find that the exculpatory contract in this case was not void and unenforceable as contrary to public policy, the contract is unenforceable as a matter of law due to its ambiguity and uncertainty. The defendants' motion for summary judgment is thus denied. Because of our determination, we do not reach the potential issue of whether Brenda Dobratz's wrongful death claim would be barred by the exculpatory contract if the contract were enforceable.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded for proceedings consistent with this opinion.