Douglas R. WERDEHOFF, Sarah L. Werdehoff, David R. Smith and Sarah Smith, Plaintiffs-Appellants,

v.

GENERAL STAR INDEMNITY COMPANY, a foreign corporation, Pacific Insurance Company, a foreign corporation, Elkhart Lake's Road America, Inc., a Wisconsin corporation, and CCS-RMS, Inc., a foreign corporation, Defendants-Respondents,

GREAT WEST LIFE & ANNUITY INSURANCE COMPANY, a foreign corporation, Defendant-Co-Appellant.

Court of Appeals

*No. 98–1932. Submitted on briefs May 21, 1999.—Decided July 21, 1999.*

(Also reported in 600 N.W.2d 214.)

491

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Virginia M. Antoine* of *Habush, Habush, Davis & Rottier, S.C.* of Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the brief of *W. Patrick Sullivan, Mary Susan Maloney,* and *Jane F. Carrig* of *Hannan, Siesenop & Sullivan* of Milwaukee.

Before Snyder, P.J., Nettesheim and Mueller,[1] JJ.

NETTESHEIM, J. Douglas R. Werdehoff and David R. Smith were injured during a motorcycle race at Road America racetrack. The race was sanctioned by CCS-RMS, Inc. Douglas and David and their respective wives, Sarah L. Werdehoff and Sarah Smith (the plaintiffs), sued Elkhart Lake's Road America, Inc., CCS-RMS and its insurers (the defendants) alleging negligence and a violation of the safe place statute, § 101.11, STATS. They additionally alleged that the defendants had acted maliciously and with intentional disregard for their rights in carrying out their responsibilities of sponsoring and conducting the racing event. The

---

[1] Circuit Judge Emily S. Mueller is sitting by special assignment pursuant to the Judicial Exchange Program.

spouses asserted claims for loss of consortium. The trial court dismissed the plaintiffs' claims at summary judgment based on the exculpatory contracts that Douglas and David signed prior to the race.

The plaintiffs contend that the exculpatory contracts are contrary to public policy and not enforceable and, thus, their claims are not barred. Although Douglas and David signed three exculpatory contracts prior to the race, we base our decision on the Road America exculpatory contract. We conclude that the Road America contract signed by Douglas and David is valid and releases each of the defendants from liability for ordinary negligence.[2] However, we further conclude that a genuine issue of material fact exists as to whether the defendants' conduct was reckless and, as such, outside the scope of the contract. Finally, we conclude that the spouses' claims for loss of consortium are not barred by the exculpatory contract. We reverse the judgment and remand for further proceedings.

## BACKGROUND

On August 5, 1995, Douglas and David participated in a motorcycle race at the Road America racetrack in Elkhart Lake. The Road America racetrack is four miles of paved asphalt and has a number of corners. The race was sanctioned by Championship Cup Series (CCS). Both David and Douglas had been licensed as amateur motorcycle racers through CCS since 1992. During the August 1995 race, Douglas and David lost control of their motorcycles on an area of the

---

[2] Since we hold that the Road America exculpatory contract is enforceable, we need not address the other exculpatory contracts which Douglas and David signed.

track that was covered by an oil spill. Both suffered serious injuries.

The accidents occurred near corner five of the race course. Because there is a lengthy distance between the fourth and fifth corners of the course, workers are stationed between the two corners. Certain workers testified that the accidents were caused by an oil slick on the track which, according to the plaintiffs, Road America officials were aware of and nevertheless failed to rectify.

On March 25, 1997, the plaintiffs filed a complaint against the defendants alleging that the accidents and attending injuries were the result of an oil slick on the track which "caused [them] to lose control of [their] motorcycle[s] and fall to the pavement, thereby suffering very serious personal injuries." Specifically, the plaintiffs alleged that the defendants were aware of the oil slick and nevertheless chose to run the race. By amended complaint, the plaintiffs alleged an additional claim for punitive damages, contending that the defendants had acted recklessly, maliciously and in intentional disregard of the plaintiffs' rights.

The defendants moved for summary judgment contending that Douglas and David "executed numerous releases, waivers of liability, hold harmless and assumption of risk agreements whereby they clearly, unambiguously, and unmistakably promised not to sue Road America or CCS for injuries arising out of the race in question, even if those injuries were caused by the negligence of Road America or CCS." In support of their motion, the defendants submitted copies of the releases signed by Douglas and David.

With respect to CCS-RMS, both Douglas and David signed a "ROADRACING LICENSE APPLICATION" for the 1995 race year. In addition to the

application information, the one-page document also included a release. The applications containing the release were signed by Douglas and David. As for the Road America events held on the weekend of August 4, CCS-RMS required applicants to sign a "Championship Cup Series Official Entry Form." This form also contained a release identical to that included in the license application. Both Douglas and David signed this release as well. In each release, the participant agrees to release and hold CCS-RMS and others involved in the races harmless from "all liability, loss, claims and demands that may accrue from any loss, damage or injury (including death, loss of limbs and permanent disablement) to my person or property, in any way resulting from, or arising in connection with this event . . . from any cause whatsoever."

Road America required that a separate release be signed before participation in the August event. The Road America release is set forth in a one-page document entitled "**RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT.**" The release has space for the signatures of eighteen participants.[3] Douglas

---

[3] The Road America release provides in pertinent part:

IN CONSIDERATION of being permitted to compete, officiate, observe, work for, or participate in any way in the EVENT(S) or being permitted to enter for any purpose any RESTRICTED AREA (defined as any area requiring special authorization, credentials, or permission to enter or any area to which admission by the general public is restricted or prohibited), EACH OF THE UNDERSIGNED, for himself, his personal representatives, heirs, and next of kin:

. . . .

2. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoters, participants, racing associations, sanctioning organizations or any subdivision thereof, track operators, track owners, officials, car owners, drivers, pit

and David signed the same release agreeing not to sue Road America and others involved in the race for "any

crews, rescue personnel, any persons in any RESTRICTED AREA, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the EVENT(S), premises and event inspectors, surveyors, underwriters, consultants and others who give recommendations, directions, or instructions or engage in risk evaluation or loss control activities regarding the premises or EVENT(S) and each of them, their directors, officers, agents and employees, all for the purposes herein referred to as "Releasees," FROM ALL LIABILITY, TO THE UNDERSIGNED, his personal representatives, assigns, heirs, and next of kin FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

3. HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the Releasees and each of them FROM ANY LOSS, LIABILITY, DAMAGE, OR COST they may incur arising out of or related to the EVENT(S) WHETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE.

4. HEREBY ASSUMES FULL RESPONSIBILITY FOR ANY RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE arising out of or related to the EVENT(S) whether caused by the NEGLIGENCE OF RELEASEES or otherwise.

5. HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS and involve the risk of serious injury and/or death and/or property damage. . . .

6. HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees . . . and is intended to be as broad and inclusive as is permitted by the laws of the . . . State in which the Event(s) is/are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

I HAVE READ THIS RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT, FULLY UNDERSTAND ITS TERMS, UNDERSTAND THAT I HAVE GIVEN UP SUBSTANTIAL RIGHTS BY SIGNING IT, AND HAVE SIGNED IT FREELY AND VOLUNTARILY WITH-

496

and all loss or damage, and any claim or demands therefor on account of injury to the person or property or resulting in death of the undersigned arising out of or related to the event(s), whether caused by the negligence of the releasees or otherwise."

In opposition to summary judgment, the plaintiffs argued that the exculpatory contracts were vague and overly broad and, as such, unenforceable as a matter of law. They additionally argued that the contracts were unenforceable as to their claims of recklessness and the spouses' claims for loss of consortium. In support of their motion, the plaintiffs submitted deposition testimony of the corner workers at Road America indicating that the oil slick caused the plaintiffs' accidents and that the defendants knew of the dangerous condition and chose to run the race in any event.

In a memorandum decision, the trial court applied the law set forth in *Yauger v. Skiing Enterprises, Inc.*, 206 Wis. 2d 76, 78, 557 N.W.2d 60, 61 (1996). The court ruled that the Road America exculpatory contract (1) clearly, unambiguously and unmistakably informed Douglas and David of what was being waived and (2) alerted them as to the nature and significance of the release. The court determined that CCS-RMS was released from liability by language in the Road America contract releasing the "sanctioning organizations or any subdivision thereof" from liability. The court further found that, with respect to the oil slick, "the risk of negligent track maintenance alleged to have caused injury in this case was clearly within the contemplation of the parties when the agreement was

OUT ANY INDUCEMENT, ASSURANCE OR GUARANTEE BEING MADE TO ME AND INTEND MY SIGNATURE TO BE A COMPLETE AND UNCONDITIONAL RELEASE OF ALL LIABILITY TO THE GREATEST EXTENT ALLOWED BY LAW.

signed." On May 29, 1998, the court ordered the dismissal of the plaintiffs' actions. They now appeal.

## DISCUSSION

The plaintiffs contend that the trial court erred in granting summary judgment to the defendants based on the exculpatory contract. They argue that the exculpatory contract is void as contrary to public policy. We disagree.

We review a summary judgment applying the same methodology as the trial court, and we consider the issues de novo. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–16, 401 N.W.2d 816, 820 (1987). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See M & I First Nat'l Bank v. Episcopal Homes Management, Inc.*, 195 Wis. 2d 485, 497, 536 N.W.2d 175, 182 (Ct. App. 1995). Summary judgment cannot be granted if there is a dispute regarding material facts or if different inferences might be drawn from the facts. *See Leverence v. United States Fidelity & Guar.*, 158 Wis. 2d 64, 74, 462 N.W.2d 218, 222 (Ct. App. 1990).

### The Validity of the Exculpatory Contract

In *Richards v. Richards*, 181 Wis. 2d 1007, 1015–16, 513 N.W.2d 118, 121 (1994), our supreme court reviewed Wisconsin law governing the enforceability of exculpatory contracts. There, the court set forth the following principles bearing on the question:

> Exculpatory contracts are not favored by the law because they tend to allow conduct below the acceptable standard of care applicable to the activ-

ity. Exculpatory contracts are not, however, automatically void and unenforceable as contrary to public policy. Rather, a court closely examines whether such agreements violate public policy and construes them strictly against the party seeking to rely on them.

In determining whether an exculpatory agreement violates public policy and is therefore void, courts recognize that public policy is not an easily defined concept. The concept embodies the common sense and common conscience of the community. Public policy is that principle of law under which "freedom of contract is restricted by law for the good of the community." An exculpatory agreement will be held to contravene public policy if it is so broad "that it would absolve [the defendant] from any injury to the [plaintiff] for any reason."

*Id.* (citations omitted; quoted sources omitted; alteration in original).

The supreme court has utilized two approaches when confronted with this issue. In earlier cases, the court used a contractual analysis in determining whether the exculpatory contract was overly broad or unduly vague. *See Dobratz v. Thomson,* 161 Wis. 2d 502, 520–25, 468 N.W.2d 654, 660–63 (1991); *Arnold v. Shawano County Agric. Soc'y,* 111 Wis. 2d 203, 210, 330 N.W.2d 773, 777 (1983), *overruled on other grounds by Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 317, 401 N.W.2d 816, 821 (1987). More recently, the court has addressed the issue in public policy terms. *See Richards,* 181 Wis. 2d at 1015–16, 513 N.W.2d at 121–22; *Yauger,* 206 Wis. 2d at 86, 557 N.W.2d at 64.

*Yauger* is the most recent case from the supreme court on this topic. Although the *Yauger* court recognized that the exculpatory contracts in *Arnold* and

*Dobratz* were determined void on a contractual basis, it nevertheless concluded that the public policy analysis applied in *Richards* provides the "germane analysis." *See Yauger*, 206 Wis. 2d at 86, 557 N.W.2d at 64. Nonetheless, because *Arnold* involved a stock car racing accident and a release resembling the one in this case, we conclude that it provides guidance as to the enforceability of the contract in this case.

The plaintiff in *Arnold* was injured during a stock car race at a county racetrack. He sustained severe brain damage when, after crashing his vehicle, rescue personnel sprayed chemicals into his burning car, creating toxic chemical fumes. Prior to participating in the race, the plaintiff had signed an agreement releasing the defendants "for all loss or damage, and any claim or demands therefor, on account of injury to the person or property or resulting in death of the Undersigned, whether caused by the negligence of Releasees or otherwise" while the plaintiff was in a restricted area. *See Arnold*, 111 Wis. 2d at 206, 330 N.W.2d at 775. The court determined that the exculpatory contract contained "very broad and general provisions" and as such would only bar those claims that were within the contemplation of the parties when the contract was executed. *See id.* at 211, 330 N.W.2d at 778. The court concluded that "[w]hile it would be reasonable to assume that this exculpatory contract was intended to preclude liability for such things as negligent maintenance of the track or the negligent driving of another driver participant, we cannot conclude that this contract was meant to cover negligent rescue operations." *Id.* at 212, 330 N.W.2d at 778. The court reversed the summary judgment because a material issue of fact existed as to whether the risk of negligent rescue oper-

500

ations was within the contemplation of the parties at the time the exculpatory contract was executed. *See id.*

In *Richards*, the supreme court examined the enforceability of the contract from a public policy standpoint. The plaintiff in *Richards* was injured while riding as a passenger in a truck operated by her husband. Before receiving permission to ride as a passenger, her husband's employer required her to sign a form entitled "Passenger Authorization" which contained a release from liability. *See Richards*, 181 Wis. 2d at 1012, 513 N.W.2d at 119. The supreme court concluded that it would be contrary to public policy to enforce the exculpatory language in the employer's form. *See id.* at 1016, 513 N.W.2d at 122. The court based its decision on a combination of three factors, none of which alone would necessarily have warranted an invalidation of the exculpatory contract: (1) "the contract serve[d] two purposes, not clearly identified or distinguished"; (2) "the release is extremely broad and all-inclusive"; and (3) "the release [was] in a standardized agreement . . . offering little or no opportunity for negotiation or free and voluntary bargaining." *Id.* at 1011, 513 N.W.2d at 119.

Finally, in *Yauger*, the supreme court examined prior Wisconsin case law and determined that the two relevant inquiries for determining the validity of the exculpatory contract in that case were: (1) does the document clearly, unambiguously and unmistakably explain to the signer that he or she is accepting the risk of the releasee's negligence? and (2) does the form, when viewed in its entirety, fail to alert the signer to the nature and significance of the document being signed? *See Yauger*, 206 Wis. 2d at 78, 557 N.W.2d at 61. The court determined that the release in that case failed in both respects.

The *Yauger* release was incorporated into the application for a family ski pass at Hidden Valley. The release stated: "I agree that . . . [t]here are certain inherent risks in skiing and that we agree to hold Hidden Valley Ski Area/Skiing Enterprises Inc. harmless on account of any injury incurred by me or my Family member on the Hidden Valley Ski Area premises." *Id.* at 79, 557 N.W.2d at 61. The *Yauger* court determined that the release was ambiguous because it "absolved Hidden Valley from the inherent risks of skiing, but failed to state whether Hidden Valley's negligence was one of the inherent risks of skiing to which the clause referred." *Id.* at 86, 557 N.W.2d at 64. The court further concluded that the form failed to clearly and unequivocally communicate to the signer the nature and significance of the document being signed because the form was an "application" and there was nothing conspicuous about the paragraph containing the waiver—it did not stand out from the rest of the form in any manner and it did not require a separate signature. *See id.* at 87, 557 N.W.2d at 64.

Relying on *Yauger*, the plaintiffs contend that the Road America release is void as against public policy because it is vague and overly broad. They argue that the contract fails to define the acts, activity and particular event that the signer will participate in and fails to specify that CCS is being released. While we agree with the plaintiffs that *Yauger* sets forth the proper analysis, we nevertheless disagree that the contract is unenforceable. Given the facts and circumstances of this case, we conclude that the contract is not so vague and broad as to violate public policy.

On August 3, 1995, Douglas and David signed the Road America release for the races to be held on the weekend of August 4. The release is a one-page docu-

ment entitled "**RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT**." Unlike the release in *Richards,* which did not specify the time period for which the release applied, the Road America release contained a space for the "description and location of scheduled event(s)." That space contains a handwritten notation that the scheduled event was Road America. Although the plaintiffs observe that the release refers to "car owners" and does not specifically name CCS as a releasee, it is reasonable to assume that the parties to the contract understood it to apply to motorcycle racing and CCS. The release was signed in contemplation of the motorcycle races to be held that weekend. Both Douglas and David had signed similar releases before. And, both Douglas and David had been licensed through CCS, the sanctioning organization, for over three years.

Not only is the release clear as to its application, but it also clearly communicates the terms of the agreement to the signer. Whereas the invalidated release in *Yauger* did not use the term "negligence" anywhere in the form, *see id.* at 84, 557 N.W.2d at 63, the Road America release uses the words "negligence" and "negligent" no less than six times—five of those times using emphasis.[4] The release is broken down into six numbered paragraphs drawing the signer's attention to the releases, waivers and acknowledgements covered by

---

[4] In *Yauger v. Skiing Enterprises, Inc.,* 206 Wis. 2d 76, 87 n.2, 557 N.W.2d 60, 64 (1996), the supreme court noted that "[a] clear, unambiguous, and unmistakable negligence waiver must be conspicuous. . . . Factors that militate in favor of conspicuousness as to print include using a larger print for the negligence waiver, using a different color print, preferably red, and italicizing or boldfacing the waiver."

the document.[5] The second paragraph provides that the signer agrees to release, waive, discharge and covenant not to sue the "sanctioning organizations" or the "track owners" for any loss or damage due to an injury related to the event whether caused by the negligence of the releasees or otherwise. The language makes clear that the signer is agreeing to release, waive liability, assume the risk and indemnify the releasees *for their negligence* with respect to each right forfeited. We agree with the trial court that the Road America release clearly, unambiguously and unmistakably explained to Douglas and David that they were accepting the risk of the releasees' negligence. *See id.* at 78, 557 N.W.2d at 61.

Moreover, the Road America release is, both in language and form, very similar to that used by the defendants in *Arnold.* There, the contract stated that the signer agreed to release the defendants "for all loss or damage . . . on account of injury to the person or

---

[5] Each of the paragraphs relating to rights forfeited by the signer begins with capitalized words indicating what the undersigned is agreeing to. For example, the release provides:

EACH OF THE UNDERSIGNED . . .:

. . . .

2.  HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE . . . .

3.  HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS . . . .

4.  HEREBY ASSUMES FULL RESPONSIBILITY FOR RISK OF BODILY INJURY . . . .

5.  HEREBY acknowledges that THE ACTIVITIES OF THE EVENT(S) ARE VERY DANGEROUS . . . .

6.  HEREBY agrees that this Release and Waiver of Liability, Assumption of Risk and Indemnity Agreement extends to all acts of negligence by the Releasees, INCLUDING NEGLIGENT RESCUE OPERATIONS . . . .

property or resulting in death of the Undersigned, whether caused by the negligence of Releasees or otherwise." *See Arnold*, 111 Wis. 2d at 206 n.1, 330 N.W.2d at 775. The supreme court concluded that "it would be reasonable to assume that this exculpatory contract was intended to preclude liability for such things as negligent maintenance of the track or the negligent driving of another driver participant." *Id.* at 212, 330 N.W.2d at 778. Here, we likewise conclude that it would be reasonable to assume that negligent maintenance of the track was within the contemplation of Douglas and David when they signed the Road America contract.

Next, the plaintiffs contend that the Road America document failed to alert Douglas and David to the nature and significance of what they were signing. Unlike the release in *Richards*, the contract signed by the plaintiffs does not serve two purposes. *See Richards*, 181 Wis. 2d at 1012, 513 N.W.2d at 119. The Road America contract is one page. Its sole purpose is to secure a release, waiver of liability and assumption of risk. Its significance is communicated not only by the requirement that it be signed before participation in the event but by the bold, capitalized language in the release, including the final statement: "I have read this release and waiver of liability, assumption of risk and indemnity agreement, fully understand its terms, *understand that I have given up substantial rights by signing it* . . . ."[6] Viewed in its totality, the document

---

[6] Neither Douglas nor David recalls reading the document despite having been afforded the opportunity to do so. Failure to read a contract will not invalidate it. "[A] contracting party, not otherwise disabled, is bound by the law to know and understand the terms of the document he or she signs." *Kellar v. Lloyd*, 180

clearly communicates its nature and significance to the signers.

We conclude that the exculpatory contract is not void as contrary to public policy. Therefore, to the extent that the defendants' negligence caused the injury to Douglas and David, their claims are barred.

Our decision on this point applies equally to the plaintiffs' negligence claim based on the safe place statute, § 101.11, STATS., which provides in relevant part that "[e]very employer . . . shall furnish a place of employment which shall be safe for employes therein and for frequenters thereof . . . ." The plaintiffs argue that Douglas and David were frequenters on the Road America premises and, as such, Road America owed them a statutory duty to remedy unsafe track conditions. However, these claims pursuant to § 101.11 are simply based on a different brand of negligence. As we have already concluded, the exculpatory contract clearly and unambiguously informed Douglas and David that in signing the contract they agreed to release the defendants from all liability due to the defendants' negligence. The plaintiffs' safe place claims are barred by the exculpatory contract.

## Recklessness

In addition to alleging negligence and a violation of the safe place statute, the plaintiffs' amended complaint alleged that Douglas's and David's accidents resulted from an oil slick on the track of which the defendants were aware. The plaintiffs asserted that

Wis. 2d 162, 174, 509 N.W.2d 87, 91 (Ct. App. 1993) (quoted source omitted).

"the defendants . . . acted maliciously toward [Douglas and David], and in intentional disregard of [their] rights in the manner in which they carried out the duties and responsibilities of sponsoring and conducting the . . . motorcycle racing event." Despite our conclusion that the Road America exculpatory contract is valid and not contrary to public policy, we nevertheless conclude that summary judgment was not appropriate in this case. We conclude that a genuine issue of material fact exists as to whether the defendants' conduct leading to the plaintiffs' injuries was reckless and, as such, outside the scope of the exculpatory contract.

■

The law in Wisconsin is clear: "[A]n exculpatory contract exempting a party from tort liability for harm caused intentionally or recklessly is void as against public policy." *Kellar v. Lloyd*, 180 Wis. 2d 162, 183, 509 N.W.2d 87, 95 (Ct. App. 1993). Recklessness "contemplates a conscious disregard of an unreasonable and substantial risk of serious bodily harm to another." *Id.* at 184, 509 N.W.2d at 95.

Relying on *Kellar*, the defendants request this court to decide, as a matter of law, that they did not act recklessly in this case. *See id.* at 184–85, 509 N.W.2d at 96. We decline to do so. Although *Kellar* states that "whether any of the defendants' conduct fulfills a recklessness standard is a question of law," it affirmed the trial court's grant of summary judgment because none of the alleged facts showed recklessness and thus any issues of fact raised were not material. *See id.* at 184–85, 509 N.W.2d at 95–96. Here, we conclude the opposite.

In opposition to the summary judgment motion, the plaintiffs submitted depositions from persons

working the Road America event in support of their contention that the defendants acted recklessly by running the race knowing that the oil slick had not been cleaned up and that it represented a dangerous condition to the racers. The depositions consisted of testimony from CCS race director William K. Fehrman, CCS announcer Robert K. Applegate, and "corner workers" Lee Rigozzi and Tracy Keeny.

Fehrman testified that he was the director for most of the races held on August 5, 1995. He is a volunteer for CCS and is responsible for "track conditions" and making sure "the races are run as per the schedule, if possible." While CCS promotes the race, Road America owns the track and is responsible for track maintenance.

Fehrman stated that on August 5, 1995, there was a major spill on the track between corners four and five which resulted from a blown motorcycle engine. Fehrman personally inspected the spill after it occurred. In his opinion, the spill was between six to twelve inches wide with a foot of spray on either side and 300 feet long. Although the corner workers hired by CCS are usually responsible for oil spill cleanup, Road America's maintenance people are responsible for cleaning up major spills. At the time of the accident, Road America was using an "emulsifying machine" to clean oil spills.

Applegate was employed by CCS and was the announcer at the August 5 race. Applegate recalled that the oil spill between corners four and five was "a big one" and that further racing was delayed for at least thirty to forty-five minutes because of clean-up efforts. According to Applegate and Rigozzi, oil spills are typically cleaned up using "Oil-Dri," a "baked clay that is crushed and commonly referred to as kitty lit-

ter. It's applied to the oil spill, . . . ground/brushed in with brooms . . . and then swept or blown off." Applegate did not recall any controversy regarding the safety of running the next race.

The plaintiffs' strongest evidence came from Rigozzi who was working with Keeny at corner five during the Road America races. Rigozzi confirmed that there was a "major spill" about one foot wide in between corners four and five. When Rigozzi approached the spill with "Oil-Dri," he was told not to put it on the racetrack. Road America maintenance then brought a machine to clean the spill. After it was done, Rigozzi went onto the track to see whether the oil had been cleaned up. He discovered that when he and another corner worker "scuff[ed] [their] feet . . . to see if it [was] slippery" he could "slide 6 to 10 feet at a time with [his] tennis shoes." According to Rigozzi, the track did not have "good adhesion" and was "very slick." In Rigozzi's opinion, the track was slick "not just from . . . residual moisture [left by the machine], but the line of oil mixed into this moisture now seemed very apparent . . . and very slippery."

Thinking that the slick might be due to the solvent left on the track by the machine, Rigozzi left the spill to dry and returned to check it later. When Rigozzi checked it again it was still slippery. He yelled to the machine operator, "[T]his ain't right. This can't be right. . . . [I]s that all you're going to do here?" The machine operator apparently did not hear Rigozzi, so Rigozzi told Keeny, the other corner worker, to radio race control[7] "to call in aid" and to inform race control that Rigozzi did not think the track was "right." Keeny

---

[7] Keeny testified that "race control" communicated with the corner workers on one radio frequency and relayed messages to the race director and race referee on a different frequency.

did as instructed and was told that the slick was residual moisture from the machine and would dry. Rigozzi told Keeny to call race control again because he did not agree that the slick would dry. Rigozzi was then ordered back to his corner station. At that time, Keeny told Rigozzi that the corner workers at corner four had also called race control to voice their concerns about the track conditions.

The next race of nine to ten cyclists was held without incident. After that race, Rigozzi again checked the spill area and found that "it was still extremely snotty to the feel and slippery under foot." He again had Keeny call in his concern to the race officials. Nonetheless, the next race, which included Douglas, David and approximately thirty-two to forty-one other cyclists, was run. In Rigozzi's opinion, the riders in that race were unable to avoid the slick because of the number of participants. Although he did not see Douglas's fall, he observed David's bike sliding on the pavement. After attempting to assist Douglas, Rigozzi went back to the track. He observed that the skidmarks and paint from the motorcycle originated in the area of the oil slick. Rigozzi tested the area with his hands and feet. The area was still slippery and greasy to the touch. Rigozzi later observed a Road America maintenance person put "Oil-Dri" on the area. In Rigozzi's opinion, the accidents would not have occurred if the oil slick had been properly cleaned up prior to the race.

Keeny's deposition testimony confirmed Rigozzi's observations. Keeny watched as Rigozzi slipped on the oil prior to Douglas and David's race. Keeny testified that she called race control before the race to inform them that the track was still wet. She also testified that the corner workers at corner four had also reported the condition and that they were told that the

race would be run because of time constraints. After the race began, Keeny observed Douglas ride through the oil and then skid as he braked. When asked why she believed the oil slick caused the accidents, Keeny replied, "Because I know that [Rigozzi] slid through that oil; I know that [the corner worker at corner four] checked that oil, and it was still wet; and I saw [Douglas] go right through the oil, and start to slide immediately after going through it."

Based on the summary judgment record, particularly the testimony of the people working in the area where the accidents occurred, we conclude that the trial court erred in granting summary judgment. We are duty bound to resolve any reasonable doubt as to the existence of a genuine issue of material fact against the moving party. *See Heck & Paetow Claim Serv., Inc. v. Heck*, 93 Wis. 2d 349, 356, 286 N.W.2d 831, 834 (1980). Here, one fair reading of the evidence is that the defendants allowed the race to go on with knowledge that the dangerous condition still existed and that this decision was made because of time constraints. A jury could fairly conclude from such evidence that the defendants acted in "conscious disregard of an unreasonable and substantial risk of serious bodily harm to another." *Kellar*, 180 Wis. 2d at 184, 509 N.W.2d at 95. We reverse the summary judgment and remand for further proceedings on the question of whether the defendants' conduct was reckless and, if so, whether such conduct caused the injuries to Douglas and David.

The Spouses' Claims

Finally, the plaintiffs contend that the spouses' claims for loss of consortium are not barred by the

exculpatory contract. This issue is squarely governed by *Arnold*. There, the supreme court held that an exculpatory contract does not defeat a spouse's right to recovery for loss of consortium. *See Arnold*, 111 Wis. 2d at 214, 330 N.W.2d at 779. Loss of consortium is a separate cause of action occasioned by a spouse's injury which never belonged to the injured spouse. *See id*. We reinstate the spouses' loss of consortium claims.[8]

## CONCLUSION

We conclude that the Road America exculpatory contract does not violate public policy. The plaintiffs' claims grounded in negligence are therefore barred. Despite our conclusion, we nevertheless reverse the trial court's grant of summary judgment. We conclude that a genuine issue of material fact exists as to whether the defendants' conduct was reckless and thus outside of the scope of the exculpatory contract. We further conclude that the spouses' claims for loss of consortium are not barred by the exculpatory contract. We reverse the order and remand for further proceedings consistent with this opinion.

*By the Court.*—Order reversed and cause remanded.

---

[8] We observe, however, that the spouses' claims are subject to any contributory negligence on the part of Douglas and David. A spouse's causal negligence can be imputed to the other spouse and defeat recovery for loss of consortium. *See Arnold v. Shawano County Agric. Soc'y*, 111 Wis. 2d 203, 214, 330 N.W.2d 773, 779 (1983), *overruled on other grounds by Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 317, 401 N.W.2d 816, 821 (1987).