# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:        2021AP1174

---

Complete Title of Case:


**KATHLEEN A. SCHABELSKI AND JAY P. SCHABELSKI,**

**PLAINTIFFS-APPELLANTS,**

**BLUE CROSS BLUE SHIELD OF ILLINOIS, A FOREIGN CORP. AND GOLDEN RULE INSURANCE COMPANY, A FOREIGN CORP.,**

**INVOLUNTARY-PLAINTIFFS,**

**V.**

**NOVA CASUALTY COMPANY, A FOREIGN CORP., FRIEDL SKI VENTURES, LLC, A WI LLC AND ALEX JAMES FUHRMAN,**

**DEFENDANTS-RESPONDENTS.**


---

| | |
|---|---|
| Opinion Filed: | June 30, 2022 |
| Submitted on Briefs: | March 16, 2022 |
| Oral Argument: | |

---

| | |
|---|---|
| JUDGES: | Neubauer, Grogan and Kornblum, JJ. |
| Concurred: | Grogan, J. |
| Dissented: | Grogan, J. |

---

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Robert D. Crivello* and *Jay M. McDivitt*, of *Cannon & Dunphy S.C.*, Brookfield. |

Respondent

ATTORNEYS: On behalf of the defendants-respondents, the cause was submitted on the brief of *W. Thomas Terwilliger* of *Terwilliger, Wakeen, Piehler, & Conway, S.C.*, Wausau.

| COURT OF APPEALS DECISION DATED AND FILED | NOTICE |
|---|---|

**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 30, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1174**

**STATE OF WISCONSIN**

Cir. Ct. No. **2019CV80**

**IN COURT OF APPEALS**

KATHLEEN A. SCHABELSKI AND JAY P. SCHABELSKI,

   PLAINTIFFS-APPELLANTS,

BLUE CROSS BLUE SHIELD OF ILLINOIS, A FOREIGN CORP. AND GOLDEN RULE INSURANCE COMPANY, A FOREIGN CORP.,

   INVOLUNTARY-PLAINTIFFS,

   V.

NOVA CASUALTY COMPANY, A FOREIGN CORP., FRIEDL SKI VENTURES, LLC, A WI LLC AND ALEX JAMES FUHRMAN,

   DEFENDANTS-RESPONDENTS.

   APPEAL from an order of the circuit court for Washington County: JAMES G. POUROS, Judge. *Affirmed in part; reversed in part and cause remanded.*

   Before Neubauer, Grogan and Kornblum, JJ.

¶1      NEUBAUER, J.   Kathleen and Jay Schabelski appeal from an order of the circuit court granting a motion for summary judgment in favor of Nova Casualty Company, Friedl Ski Ventures, LLC and Alex James Fuhrman (referred to collectively herein as Friedl).[1]   The circuit court granted Friedl's motion after concluding that the Schabelskis' claims, which arose out of Kathleen's fall from a ski lift chair at the Sunburst Winter Sports Park in Kewaskum, Wisconsin, were barred by the terms of a release they signed when they purchased lift tickets.[2]

¶2      Wisconsin law views such exculpatory releases with disfavor. *Roberts v. T.H.E. Ins. Co.*, 2016 WI 20, ¶48, 367 Wis. 2d 386, 879 N.W.2d 492.   To be enforceable, they must, among other things, "clearly, unambiguously, and unmistakably inform the signer of what is being waived." *Yauger v. Skiing Enters., Inc.*, 206 Wis. 2d 76, 84, 557 N.W.2d 60 (1996).   Here, we conclude that the release is ambiguous with respect to the Schabelskis' claim that Friedl negligently attempted to rescue her from the lift chair after it had been stopped.   The terms of the release did not clearly, unambiguously, and unmistakably inform the Schabelskis that they were releasing claims for negligent rescue.   Our conclusion means that the release is not enforceable against that claim.

¶3      We also conclude that the release does apply to any negligent conduct that occurred before the chair lift was stopped because that conduct falls within language in the release applying it to "the operation of chairlifts, and chairlift loading."   Further, we conclude that this conduct does not, as a matter of law, meet

---

[1] For ease of reference, we refer to the Schabelskis individually by their first names because they share the same surname.

[2] Friedl Ski Ventures, LLC owns and operates the Sunburst Winter Sports Park.

the standard for recklessness such that it would not be covered by the release. Finally, we reject the Schabelskis' arguments that the release is void under public policy. Accordingly, we affirm the circuit court's order in part, reverse in part, and remand this case for further proceedings on the negligent rescue claim.

## BACKGROUND

¶4 The following facts are taken from the parties' summary judgment submissions. Except as noted below, they are undisputed.

¶5 Jay has a bachelor's degree in civil engineering and a master's degree and runs a business that designs and manufactures soil testing equipment. Kathleen holds a bachelor's degree in broadcast communications and a master's degree in business administration and does accounting and human resources work for the business. Kathleen has had cerebral palsy since birth but received training from the Southeastern Wisconsin Adaptive Ski Program and became an experienced snowboarder. Before the accident, Kathleen had successfully boarded chair lifts "hundreds of times."

¶6 The Schabelskis and their son arrived at Sunburst in the morning on February 28, 2016. They purchased lift tickets from an attendant in the gift shop because the ticket window was closed. The attendant presented them with a release and briefly showed them a second form that gave them the option to purchase health insurance for an additional fee, which they declined.

¶7 The release is a one-page document entitled **"SUNBURST DAILY LIFT TICKET RELEASE OF LIABILITY AND PARENT AGREEMENT 2015-2016."** Below the title at the top of the page, the following language appears: **"PLEASE READ CAREFULLY BEFORE SIGNING. THIS IS A RELEASE**

3

**OF LIABILITY AND WAIVER OF CERTAIN LEGAL RIGHTS."** The

release then sets out the following relevant text in single-spaced paragraphs:

> I understand that skiing in its various forms, including snowboarding, involves risks, dangers, and hazards that may cause serious personal injury or death and that injuries are a common and ordinary occurrence. Risks include, but are not limited to, changes in terrain, weather and snow surfaces, ice, moguls, bare spots, rocks, stumps, debris, fences, posts, trees, lift equipment and towers, the operation of chairlifts, and chairlift loading, riding, and unloading operations, including the presence or absence of restraint bars on the chairs, light poles, signs, buildings, ramps, roads and walkways, rails, boxes, corrugated pipes, cylinders, dance floors, wall rides, rollers, and table tops and other jumps, including their height, the location of the start point, and the angle of their approaches and the angle and length of their take-off ramps and landing areas, and other terrain features, padded and non-padded obstacles, snowmaking, grooming, and snowmobile equipment and operations, and collisions with other persons and other natural and man-made hazards, including collisions with people and obstacles adjacent to and off the skiable terrain, such as snowmaking pipes, hydrants, guns, wands, and other snowmaking equipment, rocks and trees, and improperly-adjusted and malfunctioning equipment. I acknowledge the risks in the sport of skiing can be greatly reduced by taking lessons, abiding by the Skier Responsibility Code (known as Your Responsibility Code), obeying the Wisconsin Skier Safety Act, and using common sense.
>
> In consideration of the purchase of a lift ticket for Sunburst and use of its facilities, **I HEREBY RELEASE AND FULLY DISCHARGE Friedl Ski Ventures, LLC d/b/a/ Sunburst, and eco Land Holdings, LLC, their owners, officers, shareholders, directors, agents, and employees (collectively the "SUNBURST RELEASEES") from any liability resulting from any personal injury to myself, including death, which is caused by any NEGLIGENT ACT OR OMISSION of any SUNBURST RELEASEE with respect to:**
>
> > ….
>
> > - the operation of chairlifts, and chairlift loading, riding, and unloading operations, including the presence or absence of restraint bars on the chairs;

….

I accept full responsibility for any personal injury which may result from my participation in the sport, and I hereby HOLD HARMLESS the SUNBURST RELEASEES for any personal injury sustained by me, including death, caused by the negligence of any SUNBURST RELEASEE while participating in the sport. I agree not to bring any action or lawsuit against any SUNBURST RELEASEE for any personal injury caused by the NEGLIGENCE of any SUNBURST RELEASEE.

In accordance with Wisconsin law, nothing in this Release should be construed as releasing, discharging, or waiving any claims I may have for reckless or intentional acts on the part of any SUNBURST RELEASEE.

….

I understand that for a fee of $10.00 per person per day in addition to the normal lift ticket price, Sunburst offers an optional lift ticket that does not require me to sign a Release of Liability. In signing this Release of Liability, I acknowledge I am aware of this option offered by Sunburst and hereby waive my right to purchase the same.

**I HAVE CAREFULLY READ THIS LIFT TICKET RELEASE OF LIABILITY AND UNDERSTAND ITS CONTENTS. I AM AWARE THAT BY SIGNING THIS RELEASE OF LIABLITY, I AM WAIVING CERTAIN LEGAL RIGHTS, INCLUDING THE RIGHT TO SUE SUNBURST, ITS OWNERS, OFFICERS, SHAREHOLDERS, AGENTS OR EMPLOYEES FOR CERTAIN CLAIMS.**

**CAUTION: READ BEFORE SIGNING!**
**THIS DOCUMENT AFFECTS YOUR LEGAL**
**RIGHTS AND WILL BAR YOUR RIGHT TO SUE!**

Immediately below these paragraphs are lines for up to six ticket holders to print and sign their names. The circuit court described the size of most of the printed text in the release as "small; like this --- 8 point or smaller." We are unable to determine the exact size of the text, but it appears smaller than the text in this opinion, which is printed in 13-point font.

¶8     Kathleen did not ask the attendant any questions about the release. The attendant did not discuss the "nature of [the] bullet points" in the release with the Schabelskis. Kathleen did not recall seeing or discussing the language in the release allowing customers to purchase a lift ticket without signing a release for an extra ten dollars.

¶9     Kathleen did not read the release "word for word" because it contained, in her words, "very fine print," and she had never seen anyone do so before purchasing a ticket. But she believed she understood what the release meant based on her "prior knowledge of what a liability waiver typically contains"— namely, that such waivers "protect[] the ski hill if I am injured due to my own mistake." Kathleen could have read the release "word for word" had she chosen to do so. Instead, she and Jay signed the release after a brief exchange with the attendant, who seemed to Kathleen to be more focused on their potential purchase of health insurance.

¶10    With lift tickets in hand, the Schabelskis hit the slopes. Kathleen used Chairlift No. 3 once without incident and then returned to that lift with Jay for another trip up the hill. Riders board the two-person chairs on the lift from the right side of the lift looking uphill.

¶11    That morning, Sunburst employee Alex Fuhrman was attending the lift. After Kathleen's first run, which she described as "a little bit shaky," Fuhrman asked her if it was her first time snowboarding, to which she responded by "point[ing] to the multiple tags that I had on my jacket and said 'No, I've done this before.'" She also explained to him that she had a disability. According to Fuhrman, Kathleen was "a little bit shaky" each time she boarded, "but she always settled in before she started taking off upwards."

¶12    Jay recalled that loud music was playing in the loading area that morning. Fuhrman did not specifically remember playing music that morning but did recall bringing a speaker to his work area at times. Sunburst did not prohibit employees from playing music in their work areas.

¶13    After their son boarded a chair, the Schabelskis moved into the loading position and waited for a chair to arrive behind them. Kathleen always rode chair lifts with another person, but did not usually require physical assistance once she was seated in the chair. She described the speed at which the lift was moving that morning as "on the slower side."

¶14    Kathleen, Jay, and Fuhrman gave deposition testimony about what happened next. Their accounts differ in two principal respects. The first is whether Fuhrman "bumped" the lift chair just before the Schabelskis boarded. A lift attendant "bumps" a chair by stalling it as it reaches a rider, which briefly slows the chair to prevent it from hitting the backs of the rider's legs. Bumping also tilts the chair slightly, allowing the rider to sit down in the chair as it arrives at the rider's position. When the attendant releases the chair, it swings forward slightly and plants the rider in the seat. Fuhrman received training on how to bump chairs at Sunburst.

¶15    According to Kathleen, Jay boarded the lift chair safely when it reached them but she was only able to get herself partially on the chair and was left "dangling" as it continued to move forward. Kathleen did not know why she was unable to seat herself fully on the chair and did not recall whether Fuhrman bumped the chair before it reached them.

¶16    According to Jay, Fuhrman did not bump the chair as the Schabelskis attempted to board. Jay testified that Fuhrman was shoveling snow onto the path between the waiting area and the loading area as he and Kathleen attempted to

board, but later acknowledged that he "d[id]n't really know where the lift attendant was" when they boarded.

¶17    Fuhrman denied shoveling snow when the Schabelskis were boarding, though he did acknowledge shoveling between passenger boardings. Fuhrman testified that "whenever [Kathleen] boarded I was paying complete attention, because I was a little nervous about the way she boarded." Fuhrman also testified that he bumped the chair for her on the run on which she fell and was "fairly certain" that he "bumped the chair every time for her, because it made me nervous the way she boarded the chair. It took extra long for her to get settled."

¶18    The second area of dispute between Fuhrman and the Schabelskis concerns what happened after the lift chair left the loading area and began moving up the hill. As the chair moved forward with Kathleen only partially on board, she "was very surprised, because typical procedure is the lift is stopped immediately." She and Jay yelled, "Stop" as he held onto her. Then, according to Kathleen,

> instead of stopping the lift immediately when he recognized that there was a problem, [Fuhrman] ran out and asked, "Do you want me to stop the lift" as I'm dangling from it, getting higher and higher off the ground. And of course we immediately say "Yes." But by the time he runs back and stops the lift I'm between 15 and 20 feet off the ground.

Kathleen estimated that Fuhrman ran ten to fifteen feet to ask her if she wanted him to stop the lift, at which point she was "[p]artially seated, hanging on desperately."

¶19    Fuhrman disputed the Schabelskis' claim that they began yelling for the lift to be stopped almost immediately after they boarded, though he did acknowledge "a small possibility" that he did not hear them because of the music playing in the loading area. Fuhrman testified that he watched the Schabelskis depart the loading area "to see if she would get settled in." As Kathleen started "to

gain some air and did not settle in at the usual comfortable time that I watched her settle in," Fuhrman asked if she was all right and if she wanted him to stop the lift. According to Fuhrman, Jay responded, "No, we'll be all right." Fuhrman continued to watch the Schabelskis and eventually tried to "push up on her snowboard to give that upward pressure to sink her up and back into the chair." When that proved unsuccessful, Fuhrman asked again if Kathleen needed the lift stopped and Jay said, "Yeah, stop the lift." Fuhrman testified that he "immediately ran right back to the station and hit the button" and the lift slowed to a stop.

¶20     Fuhrman and Kathleen estimated that she hung on to the chair for around ten minutes before she fell to the ground. In that time, two other employees came over to where Kathleen was located. According to Kathleen, the first employee walked over "very slowly," looked up at her and said, "I need to get a ladder," and walked back. A second employee then came over with, in Kathleen's words, "something that clearly was not going to be tall enough to do the job."[3] According to Kathleen, the second employee said, "Oh, that's not going to work," and left. She did not see Fuhrman after the lift came to a stop.

¶21     Sunburst did not have a "protocol" for situations like the one in which Kathleen found herself. Chairlift evacuations are overseen by Sunburst management and are performed by management, ski patrol, other employees and, if necessary, the Kewaskum Fire Department. Sunburst did not have "catch nets" on its premises because its owner deemed them dangerous to use. Sunburst did not attempt to use ropes and a seat to lower Kathleen off the lift because it would only use that method if the chairlift was not operational and could not be restored to

---

[3] Though not clear from the record, the "something" Kathleen referred to may have been a ladder or a "gator" utility vehicle.

operation using a secondary emergency motor. According to an expert witness for the Schabelskis, it is "standard custom and practice" for mountain resorts in North America to provide evacuation training and equipment to lift attendants and to have "rescue devices immediately available at the loading area" to evacuate misloaded passengers.

## PROCEDURAL HISTORY

¶22 The Schabelskis commenced this action in February 2019. Their complaint included the following allegations of negligence against Fuhrman (and Friedl pursuant to vicarious liability):

> That at all times material hereto, the defendant, Alex James Fuhrman, was negligent in that he, among other things, failed to stop the subject ski lift in a timely manner; failed to exercise a proper lookout for Mrs. Schabelski on the ski lift; failed to have proper management and control of the ski lift; and/or otherwise failed to exercise ordinary care for the safety of the plaintiff, Kathleen A. Schabelski, thereby creating a foreseeable risk of harm to her; and was otherwise negligent.

In August 2019, the circuit court set a dispositive motion briefing schedule focused on the release. Following the submission of briefs, the court issued an "Interim Decision and Order" denying Friedl's motion with leave to re-file and giving the parties time to conduct additional discovery.

¶23 Friedl filed a "supplemental" motion for summary judgment in December 2020. In their opposition, the Schabelskis identified allegedly negligent conduct not mentioned in their complaint—Sunburst's rescue operations and emergency response—and argued that it fell outside the scope of the release. On May 24, 2021, the circuit court issued an order granting Friedl's supplemental motion. The court found that there were no genuine issues of material fact and

concluded that the release was enforceable under Wisconsin law and barred the Schabelskis' claims.

¶24 The Schabelskis appeal. We include additional facts as necessary in the discussion below.

## DISCUSSION

¶25 Whether the circuit court properly granted summary judgment is a question of law that we review de novo. *Atkins v. Swimwest Fam. Fitness Ctr.*, 2005 WI 4, ¶11, 277 Wis. 2d 303, 691 N.W.2d 334. Summary judgment is appropriate if "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2) (2019-20).

¶26 The Schabelskis argue that the release does not apply to their claims and that the release is unenforceable as a matter of law. We begin by discussing the legal principles that govern the analysis of exculpatory releases in Wisconsin.

¶27 Wisconsin law does not favor exculpatory releases because "they tend to allow conduct below the acceptable standard of care applicable to the activity." *Richards v. Richards*, 181 Wis. 2d 1007, 1015, 513 N.W.2d 118 (1994). Wisconsin courts construe such releases strictly against those who seek to rely on them. *Atkins*, 277 Wis. 2d 303, ¶12.

¶28 In its most recent decision examining an exculpatory release, our supreme court identified a two-step process for analyzing whether a release is enforceable. *Roberts*, 367 Wis. 2d 386, ¶49. First, we must "examin[e] the facts and circumstances of the agreement to determine if it covers the activity at issue." *Id.* If the activity is not covered by the release, then the release "should be

determined to be unenforceable in regard to such activity." ***Atkins***, 277 Wis. 2d 303, ¶13. If the release does cover the activity in question, then we proceed to the second step of determining whether the release is enforceable under public policy. ***Roberts***, 367 Wis. 2d 386, ¶49.

¶29     Public policy refers to the "principle of law under which freedom of contract or private dealings is restricted by law for the good of the community." ***Merten v. Nathan***, 108 Wis. 2d 205, 213, 321 N.W.2d 173 (1982) (citation omitted). In undertaking the public policy analysis, we attempt to balance the tension between contract law, which seeks to protect the ability to "manage [one's] own affairs without government interference," and tort law, which seeks to deter conduct below the standard of care and compensate persons injured by the unreasonable conduct of others. ***Richards***, 181 Wis. 2d at 1016. With these principles in mind, we turn to the parties' arguments.

### I.     Activities Covered by the Release

#### A. Rescue Operations

¶30     The Schabelskis argue that the release is ambiguous as applied to Sunburst's allegedly negligent rescue of Kathleen, or that a genuine issue of material fact exists concerning whether negligent rescue was within the parties' contemplation when the Schabelskis signed the release. To be clear, we understand the Schabelskis' negligent rescue claim to encompass Friedl's acts or omissions that came into play during the attempt to rescue Kathleen from the lift. These acts or omissions started after Fuhrman stopped the chair lift and include (1) the alleged failure to have proper rescue equipment on hand; (2) allegedly inadequate training of resort employees to respond to a rider hanging from a lift chair; and (3) the

purported lack of adequate written plans or procedures for responding to evacuating riders.

¶31 Friedl argues that the efforts to rescue Kathleen are within the release because it applies to "the operation of chairlifts, and chairlift loading, riding, and unloading operations." More specifically, Friedl contends that the attempts to get Kathleen off the lift before she fell were part of "unloading operations." We agree with the Schabelskis that the release is, at best, ambiguous as applied to Sunburst's allegedly negligent rescue operations.

¶32 In determining whether a specific activity is covered by an exculpatory release, we focus on whether the risk of that act was within the parties' contemplation when the release was signed. *Atkins*, 277 Wis. 2d 303, ¶21. For example, in ***Arnold v. Shawano County Agricultural Society***, our supreme court examined an exculpatory release that purportedly barred negligence claims asserted by a driver whose car left the racetrack, crashed, and caught fire. 111 Wis. 2d 203, 330 N.W.2d 773 (1983), *overruled on other grounds by **Green Spring Farms v. Kersten***, 136 Wis. 2d 304, 401 N.W.2d 816 (1987). Among other things, the driver alleged that track personnel negligently sprayed chemicals to extinguish the fire while he was still in the car, which caused him personal injuries. *Arnold*, 111 Wis. 2d at 204-05. The release contained broad language that applied to "all liability … for all loss or damage, and any claim or demands therefor … whether caused by the negligence of Releasees or otherwise." *Id.* at 206 n.1.

¶33 The supreme court held that this language was ambiguous as applied to the attempts to rescue the driver. *Id.* at 212. Though it "would be reasonable to assume that this exculpatory contract was intended to preclude liability for such things as negligent maintenance of the track or the negligent driving of another

driver participant," the court could not "conclude that this contract was meant to cover negligent rescue operations." *Id.* To withstand scrutiny, the release must "clearly express the intent of the parties so that with the surrounding circumstances, it is clear the parties knowingly agreed to excuse one of them from otherwise responsible acts." *Id.* at 213.

¶34 The release at issue in this case is more specific than that in *Arnold* insofar as it contains nine bulleted statements that describe categories of conduct to which it applies. However, rescuing or providing aid to imperiled lift riders is not specifically mentioned in any of the categories. Friedl argues that the specific injury-causing act need not be specified in the release and maintains that the phrase "unloading operations" is broad enough to cover the efforts to rescue Kathleen. We do not believe that phrase clearly expresses the parties' intent to release claims for the negligent rescue of a rider in Kathleen's circumstances.

¶35 The release does not define "unloading," but as relevant here, its ordinary meaning is "to take off" or "to take the cargo from." *Unload,* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (unabr. 1993); *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 507, 577 N.W.2d 617 (1998) ("dictionary definitions are dispositive of the ordinary meanings ascribed to contract terms"). In the context of riding a chair lift, "unloading" can reasonably be understood to refer to the process by which a rider gets off the lift at a designated point along the lift's path, just as "loading" can reasonably be understood to refer to the process of getting on the lift at a designated point along the path. Both processes connote a degree of intention and orderliness. Riders intend to board and exit a lift at points along the lift path designed for those activities. Lift attendants provide assistance as needed to enable riders to accomplish both tasks safely and in an orderly fashion.

14

¶36 One would not necessarily think of efforts to rescue a rider in danger of falling off a halted chair lift as "unloading" that rider. Such efforts lack the regularity and orderliness of normal "loading" and "unloading operations." Instead, they are dictated by the circumstances giving rise to the need for rescue. In addition, as the Schabelskis point out, Sunburst appears to treat unloading and rescue operations as distinct activities. Whereas lift attendants like Fuhrman provide assistance with loading and unloading, Sunburst's management oversees "chairlift evacuation," which is performed "by management, ski patrol, all employees, and also the Kewaskum Fire Department" when necessary.

¶37 Finally, we note that the distinction between "unloading" and "evacuating" riders is present throughout the American National Standards Institute's (ANSI) safety standards applicable to aerial lifts, which are incorporated by reference into the Wisconsin Administrative Code. *See* WIS. ADMIN. CODE § SPS 333.17(1) (Mar. 2014). The ANSI standards repeatedly refer to the location at which "unloading" occurs as a designated point, such as an "area," "platform," or "station." AMERICAN NAT'L STANDARD FOR PASSENGER ROPEWAYS—AERIAL TRAMWAYS, AERIAL LIFTS, SURFACE LIFTS, TOWS & CONVEYORS—SAFETY REQUIREMENTS, ANSI B77.1-2011, § 4.1.1.7 (AM. NAT'L STANDARDS INST. 2011) (requiring two-way communication system "between the prime mover and evaluation power unit control point, drive system building, loading stations, and unloading stations"); § 4.1.1.9 ("Platforms, ramps, corrals, and mazes comprising the loading and unloading areas of an aerial lift are integrally related to its operation."); § 4.1.1.9.2 ("For chair lifts, the unloading point where the passengers stand up and disembark shall be marked on or near the unloading surface."). The standards separately address requirements for unloading areas and evacuation of stranded passengers. *Id.*, §§ 4.1.1.9, 4.1.1.9.2 (discussing requirements for

15

unloading areas); § 4.3.2.5.7 (listing items to be included in "plan for evacuation of passengers from each aerial lift"); *see also* ***id.***, § 4.2.13.4 (requiring emergency lighting to permit "regular unloading of an aerial lift" and "emergency evacuation of carriers"); § 4.3.6.2 (Passengers "shall be presumed to have sufficient ability, physical dexterity, and/or personal assistance to negotiate and to be *evacuated* from the aerial lift safely. Passengers shall maintain control of their speed and course while *loading* and *unloading* the aerial lift." (emphasis added)).

¶38    To summarize, our task is to determine whether the parties contemplated release of the activity at issue, which we do by strictly construing the release's terms to determine whether they "clearly, unambiguously, and unmistakably inform the signer" that liability for the activity at issue is being waived. ***Yauger***, 206 Wis. 2d at 84, 86 (citing "the well established principle that exculpatory contracts are construed strictly against the party seeking to rely on them"). Here, the Schabelskis have set forth facts on summary judgment to support their assertion that Friedl failed to have proper training, a proper plan, and proper equipment to evacuate or rescue skiers who are hanging from a lift. This failure is alleged to be a cause of Kathleen's injuries separate and distinct from any negligence in Friedl's operation of the chairlift. *See **Ehlinger by Ehlinger v. Sipes***, 155 Wis. 2d 1, 12-13, 454 N.W.2d 754 (1990) (there may be more than one cause in contributing to the result, as long as it is a substantial factor). Our supreme court has repeatedly made clear that the terms of the release must be specific in describing the risks for which the signer is releasing liability. *See, e.g.*, ***Roberts***, 367 Wis. 2d 386, ¶¶59-60 (invalidating release in which hot air balloon riders assumed "full responsibility for all risks of any and every kind involved with or arising from my participation in hot air balloon activities"). We conclude that the release did not "clearly, unambiguously, and unmistakably" inform the Schabelskis that they were

releasing Friedl from liability for a negligent rescue attempt in the event they found themselves in danger of falling from a lift chair.

¶39    These considerations lead us to conclude that the phrase "unloading operations" is, at a minimum, ambiguous as applied to the efforts to rescue Kathleen after Fuhrman stopped the chair lift.  Had Friedl wished to make clear that riders were giving up the right to sue for negligent rescue, that "certainly could have been written into the agreement."  *See Arnold*, 111 Wis. 2d at 214.  Accordingly, the release is not enforceable with respect to the Schabelskis' claim of negligent rescue.

### B.  Pre-Rescue Conduct

¶40    Friedl argues that the Schabelskis have conceded that other allegedly negligent conduct up to the point at which Fuhrman stopped the lift, such as playing music in the loading area, failing to "bump" the lift chair, shoveling snow as the Schabelskis boarded, and not immediately stopping the lift, are part of "the operation of chairlifts and chairlift loading, riding, and unloading operations."  The Schabelskis do not offer a substantive response to this argument in their reply brief.

¶41    We agree that the Schabelskis' negligence claim is within the scope of the release to the extent it is predicated on Fuhrman's actions before the chairlift stopped.  Even if a jury were to find that Fuhrman was playing loud music, did not bump the Schabelskis' chair, shoveled snow while they boarded, and delayed in stopping the lift, those acts are covered by the release because they are part of "the operation of chairlifts" and "chairlift loading."

### C.  Recklessness

¶42    The Schabelskis make a second scope-related argument—that a reasonable jury could find Fuhrman's conduct to be reckless and thus not covered

17

by the release. *See **Brooten v. Hickok Rehab. Servs., LLC***, 2013 WI App 71, ¶10, 348 Wis. 2d 251, 831 N.W.2d 445 ("It is well-settled that an exculpatory clause … cannot, under any circumstances … preclude claims based on reckless or intentional conduct."). Because we have already determined that the release is unenforceable with respect to the Schabelskis' claim based on rescue operations, we consider their recklessness argument only with respect to Fuhrman's conduct before he stopped the lift.

¶43 Recklessness "contemplates a conscious disregard of an unreasonable and substantial risk of serious bodily harm to another." ***Noffke ex rel. Swenson v. Bakke***, 2009 WI 10, ¶36, 315 Wis. 2d 350, 760 N.W.2d 156 (citation omitted). "Conduct which creates a high risk of physical harm to another is substantially greater than negligent conduct. Mere inadvertence or lack of skill is not reckless conduct." ***Id.*** (citing WIS JI—CIVIL 2020). Whether Fuhrman's conduct meets the standard for recklessness is a question of law. *See **Kellar v. Lloyd***, 180 Wis. 2d 162, 184, 509 N.W.2d 87 (Ct. App. 1993).

¶44 The Schabelskis rely on our decision in ***Werdehoff v. General Star Indemnity Co.***, 229 Wis. 2d 489, 600 N.W.2d 214 (Ct. App. 1999). In that case, two motorcycle racers brought suit after they lost control of their motorcycles during a race when they slipped on an area of the track that was covered by oil. ***Id.*** at 493-94. The defendants argued that the racers' claims were barred by several exculpatory releases. ***Id.*** at 494. The circuit court granted summary judgment to the defendants but we reversed after concluding that the record contained a genuine issue of material fact as to whether the defendants' conduct was reckless. ***Id.*** at 507. Specifically, we relied on deposition testimony from four race workers which revealed that (1) there had been a "major spill" of oil on the track before the plaintiffs' race; (2) the spill area remained slippery after efforts to clean the oil off

18

the track; and (3) race officials went ahead with the race because of "time constraints" despite warnings from workers near the spill area about the slippery conditions. *Id.* at 508-511. Based on the evidence, we determined that a jury could reasonably conclude that the defendants had acted recklessly in "allow[ing] the race to go on with knowledge that the dangerous condition still existed and that this decision was made because of time constraints." *Id.* at 511.

¶45 We do not believe a reasonable jury could reach a similar conclusion with respect to Fuhrman's conduct before he stopped the lift. Before the ride on which Kathleen fell, she told Fuhrman that she had a disability and he had observed her being "a little bit shaky" when boarding the chair lift. However, Kathleen also informed Fuhrman that she had boarded a lift before, and he had seen that she was able to "settle in" to the lift chair on at least one prior trip. Kathleen also described the speed at which the lift was moving that morning as "on the slower side." Given these facts, boarding the lift chair did not present "an unreasonable and substantial risk of serious bodily harm" to Kathleen. *See Noffke*, 315 Wis. 2d 350, ¶36. Any risk that boarding a slow-moving lift chair presented was materially less than the oil-slicked track on which motorcycles were racing at high speed in *Werdehoff*.

¶46 Additionally, even if we accept the Schabelskis' version of events during the boarding process as true, no reasonable juror could conclude that Fuhrman consciously disregarded a risk that the boarding process could result in serious bodily injury to Kathleen. Assuming that Fuhrman was playing music in the loading area, did not bump the slow-moving lift chair before the Schabelskis boarded, and did not initially hear them yell for the lift to be stopped, the Schabelskis acknowledge that Fuhrman did ask if they wanted the lift stopped and that he stopped the lift when they said, "Yes." When alerted that Kathleen may not have loaded properly, Fuhrman took action to confirm if she needed assistance and

19

stopped the lift when asked to do so. That he may not have bumped the lift chair or stopped the lift as quickly as he could have shows, at most, "inadvertence, or simple negligence" rather than a conscious disregard for Kathleen's safety. *See Noffke*, 315 Wis. 2d 350, ¶37.

## II. Public Policy

¶47 Because we have concluded that at least some of Friedl's allegedly negligent conduct is within the scope of the release, we must consider whether the release is enforceable under public policy. *Roberts*, 367 Wis. 2d 386, ¶49. The Schabelskis raise three arguments as to why the release is unenforceable, which we address below.

### A. Overbreadth

¶48 The Schabelskis argue that certain "catch-all" language in the release renders it overbroad and unenforceable. Specifically, they focus on the following paragraph, which appears immediately below the nine bulleted statements that identify categories of negligence that are covered by the release:

> I accept full responsibility for any personal injury which may result from my participation in the sport, and I hereby HOLD HARMLESS the SUNBURST RELEASEES for any personal injury sustained by me, including death, caused by the negligence of any SUNBURST RELEASEE while participating in the sport. I agree not to bring any action or lawsuit against any SUNBURST RELEASEE for any personal injury caused by the NEGLIGENCE of any SUBURST RELEASEE.

This language, when read together with the text that precedes it, does not render it fatally overbroad.

20

¶49    An exculpatory release violates public policy when its terms purport to shield a defendant from liability for any reason.  *Roberts*, 367 Wis. 2d 386, ¶59. In *Atkins*, 277 Wis. 2d 303, ¶19, our supreme court refused to enforce a one-paragraph release that insulated a fitness center from liability without regard to "fault" because that term was "broad enough to cover a reckless or an intentional act."  More recently, in *Roberts*, 367 Wis. 2d 386, ¶¶59-60, the supreme court held that language in a release requiring persons wishing to ride in a hot air balloon to "assume full responsibility for all risks of any and every kind involved with or arising from … participation in hot air balloon activities" and to hold certain parties harmless "for[] all claims, rights, demands or causes of action whether known or unknown, suspected or unsuspected, arising out of the ballooning activities" was overbroad because it would protect the released parties from liability "for any activity for any reason, known or unknown."

¶50    Sunburst's release is materially distinguishable from those at issue in *Atkins* and *Roberts*.  First, the release expressly applies only to negligent conduct. In the second full paragraph, the release states that the signer is releasing the "SUNBURST RELEASEES" from "any liability resulting from any personal injury to myself, including death, which is caused by any NEGLIGENT ACT OR OMISSION of any SUNBURST RELEASEE with respect to" specific categories of conduct listed in nine bulleted statements that appear immediately below the paragraph.  In the paragraph that follows those bulleted statements, the release refers to "the negligence of any SUNBURST RELEASEE" twice in specifying what claims are being released.  The release then states that it is not to be construed "as releasing, discharging, or waiving any claims I may have for reckless or intentional acts on the part of any SUNBURST RELEASEE."  Together, these provisions clearly and expressly limit the release to negligent conduct in line with our supreme

21

court's prior suggestion. *See Atkins*, 277 Wis. 2d 303, ¶20 ("While this court has never specifically required exculpatory clauses to include the word 'negligence,' we have stated that 'we consider that it would be very helpful for such contracts to set forth in clear and express terms that the party signing it is releasing others for their negligent acts.'" (citing *Dobratz v. Thomson*, 161 Wis. 2d 502, 525, 468 N.W.2d 654 (1991))).

¶51    Second, rather than asking participants to assume all risks associated with skiing or snowboarding at Sunburst, the release specifically identifies the categories of negligent conduct which it covers in the bulleted statements. This distinguishes the Sunburst release from the release at issue in *Roberts*, which failed to identify any specific risks associated with hot air balloon riding and did not limit its scope to specific acts or omissions. *See Roberts*, 367 Wis. 2d 386, ¶60.

¶52    The Schabelskis focus on the paragraph following the bulleted statements and argue that it improperly expands the scope of the release to encompass "any" negligent conduct and renders the bulleted statements superfluous. We do not agree.

¶53    In construing the terms of the release, we strive to give each provision meaning and avoid interpretations that render language superfluous. *See Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶37, 363 Wis. 2d 699, 866 N.W.2d 679. Here, the paragraph that follows the bulleted statements consists of two sentences that memorialize complementary obligations that ensure compliance with the release. In the first sentence, the Schabelskis agree to hold the "SUNBURST RELEASEES" harmless for injuries caused by the releasees' negligence. In the second sentence, the Schabelskis promise not to bring a lawsuit against any of the "SUNBURST RELEASEES" for injuries caused by the releasees' negligence.

¶54    When read together with the preceding paragraph that contains the actual promise to release from liability, these two sentences impose obligations that correspond to, and are coterminous with, the release obligation.  That is to say, the Schabelskis (1) agree to release the "SUNBURST RELEASEES" from liability for certain, specified negligent conduct; (2) agree to comply with the release by holding the "SUNBURST RELEASEES" harmless from such negligence liability; and (3) agree not to sue the "SUNBURST RELEASEES" for the negligent conduct that has been released.  Even if the inclusion of the word "any" in the paragraph following the bulleted statements might make the scope of the release uncertain, we would be obliged to construe the release strictly against Friedl and limit it to the specific activities listed in the bulleted statements.  *See Atkins*, 277 Wis. 2d 303, ¶19.[4]

### B.  Misrepresentation

¶55    The Schabelskis also contend that an issue of fact exists as to whether the gift shop attendant who provided the release misled them concerning the nature of the second form she showed them when they purchased lift tickets.  Recall that the release informs a ticket holder that "for a fee of $10.00 per person per day in addition to the normal lift ticket price, Sunburst offers an optional lift ticket that does not require me to sign a Release of Liability."  The Schabelskis suggest that the gift shop attendant mistakenly described the second form she showed to them as one relating to the purchase of additional health insurance, when in fact the second form gave them the opportunity to pay an extra $10.00 fee and not sign a release of

---

[4] The Schabelskis also contend that Sunburst "impliedly recognized" the overbreadth of this paragraph because it removed the paragraph from a later version of the release.  Friedl denies any such recognition and states that the paragraph was removed because it was determined to be unnecessary.  We need not resolve this disagreement, as the Schabelskis' speculation as to Sunburst's motive for removing the paragraph is not sufficient to establish that it makes the release impermissibly broad in light of the other language that limits the release to specific negligent conduct.

liability. Thus, the Schabelskis argue they may have been misled into believing that their chance to bargain was about purchasing insurance, rather than signing or not signing the release.

¶56    In support of this argument, the Schabelskis rely primarily on our supreme court's decision in *Merten*. In that case, the plaintiff signed a release in connection with taking horseback-riding lessons which stated, among other things, that the farm providing the lessons did not have insurance covering equestrian activities. *Merten*, 108 Wis. 2d at 208. After the plaintiff was injured during a lesson, she learned that the farm did have insurance coverage. *Id.* at 209. The supreme court determined that the misrepresentation contained in the release about the existence of insurance coverage went "to the essence of the contract, that is, how and why the risks of loss are to be shifted from the prospective negligent actor to the victim." *Id.* at 213. It raised a "strong suspicion of inequitable motive and overreaching and of lack of good faith or fair dealing on the part of the party seeking the release and of oppression of the party executing the release." *Id.* at 214. Because the purported lack of insurance was "highly relevant" to a student's decision to sign the release in order to receive the lessons, the misstatement deprived the bargaining process of integrity and rendered the release unenforceable. *Id.* at 214-15.

¶57    The present case is distinguishable from *Merten* in that there is no evidence that the release contained a misrepresentation of fact. Moreover, even if the Schabelskis are correct that the attendant described the second form as relating to insurance, whether there was health insurance or not was not relevant to the Schabelskis' decision whether to choose the "no release" option set forth in the release. Even if the attendant misspoke, that would mean there was simply a missed opportunity to provide the same "no release" information as set forth in the release.

The Schabelskis would have known about the availability of a "no release" lift ticket by reading the release before they signed it. As it stands, having signed the release, they are presumed to have read it and understood its contents. *See **Parsons v. Associated Banc-Corp***, 2017 WI 37, ¶36, 374 Wis. 2d 513, 893 N.W.2d 212 ("those who sign written instruments are presumed to know their contents and their legal effect" (citation omitted)). In short, the offer of the health insurance in no way prevented the Schabelskis from reading the release and then pursuing the "no release" option. The record does not show that a false statement of fact relevant to a reasonable person's decision to sign the release was made to the Schabelskis in the release.

### C. Opportunity to Bargain

¶58 Lastly, the Schabelskis contend that the release is unenforceable because they were not afforded an opportunity to bargain over its terms. The bargaining factor has been addressed by our supreme court on several occasions. In ***Richards***, 181 Wis. 2d at 1019, the court invalidated an exculpatory release contained in a standard form authorization that the plaintiff had to sign in order to ride in the company truck driven by her husband because, among other things, the form offered "little or no opportunity for negotiation or free and voluntary bargaining." The court considered the lack of such an opportunity problematic "when considered with the breadth of the release," which purported to release liability for "intentional, reckless, and negligent conduct" of the husband's employer and numerous other persons and entities. ***Id.*** at 1017-1019.

¶59 In ***Atkins,*** 277 Wis. 2d 303, ¶¶25-26, the court again invalidated a release based in part on the lack of an opportunity to bargain over its terms. There, as in ***Richards***, the signer was forced to accept the terms of the release or forego the

chance to participate in the activity at issue. *Atkins,* 277 Wis. 2d 303, ¶26. The decedent had the opportunity to read Swimwest's release and ask questions about it, but that did not satisfy public policy because "[t]he form itself" did not provide an opportunity to bargain. *Id.*, ¶25. Though the supreme court did not mention the breadth of the release in its discussion of the bargaining requirement, the release in *Atkins* was also very broad—it purported to relieve Swimwest of "ALL LIABILITY … WITHOUT REGARD TO FAULT." *Id.*, ¶4.

¶60     Finally, in *Roberts*, 367 Wis. 2d 386, ¶8, the plaintiff had to sign a release printed on a standard form in order to ride in a hot air balloon. The scope of the release was again broad: the signer assumed "full responsibility for all risks of any and every kind involved with or arising from my participation in hot air balloon activities" and released "all claims, rights, demands or causes of action … arising out of the ballooning activities." *Id.*, ¶9. Our supreme court concluded that the breadth of the release combined with the plaintiff's inability to negotiate over its terms violated public policy. *Id.*, ¶¶59-62.

¶61     The Sunburst release is materially distinguishable from the releases invalidated in these cases. Though printed on what appears to be a standardized form, the release applies only to specified categories of conduct. The release is expressly limited to negligence and specifically disclaims application to reckless or intentional conduct. Moreover, the Sunburst release was not presented to customers on a take-it-or-leave-it basis: persons wishing to ski or snowboard at Sunburst could sign the release or pay an extra $10.00 for a non-release lift ticket. The release afforded customers an opportunity to bargain because it allowed them to select one of two sets of terms: (1) the base ticket price in exchange for the release or (2) a higher ticket price with no release. Because the form itself alerted customers to the availability of release and no-release options, it afforded the Schabelskis an

opportunity to bargain.[5]  Although the font was small, Kathleen testified that she could have read the release "word for word."  That she may not have been aware of the "no release" option because she did not take the time to read the release does not mean it did not present the opportunity to bargain.  *See **Richards***, 181 Wis. 2d at 1017 ("A person signing a document has a duty to read it and know the contents of the writing.").

## CONCLUSION

¶62    For the reasons stated above, we affirm the circuit court's order insofar as it granted Friedl summary judgment with respect to the Schabelskis' negligence claim based on Fuhrman's conduct before he stopped the lift chair.  We reverse the circuit court's order with respect to the Schabelskis' claim of negligent rescue and remand for further proceedings on that claim.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded.

---

[5] The Schabelskis caution us against reaching this conclusion because, in their view, we would be straying from our role as an error-correcting court into making "final determinations affecting state law." ***State ex rel. Swan v. Elections Bd.***, 133 Wis. 2d 87, 93, 394 N.W.2d 732 (1986).  We disagree.  Our conclusion that the Sunburst release satisfies ***Atkins'*** requirement that a release afford the signer an opportunity to bargain rests on the application of established legal principles to the particular facts before us.  That the supreme court has not addressed this issue on these facts does not prevent us from doing so.  *See **Cook v. Cook***, 208 Wis. 2d 166, 188, 560 N.W.2d 246 (1997) ("under some circumstances [the court of appeals] necessarily performs a second function, that of law defining and development, as it adapts the common law … in the cases it decides").

No. 2021AP1174(CD)

¶63 GROGAN, J. (*concurring in part; dissenting in part*). I join the part of the majority opinion that affirms the circuit court's order; however, I dissent from the part of the majority opinion that reverses the circuit court's order for two reasons. First, I disagree with the majority opinion excepting from the release what it terms "negligent rescue" or "rescue operations." Second, I disagree that the release is ambiguous as to whether it covered the negligent acts that allegedly caused the injuries in this case. The release protects Sunburst from any negligence suits from injuries the Schabelskis claim Sunburst caused with respect to: "the operation of chairlifts, and chairlift loading, riding, and unloading operations, including the presence or absence of restraint bars on the chairs[.]" This specific language put the Schabelskis on notice that they were releasing Sunburst from liability for any injuries caused by Sunburst's negligence with respect to each of those things. The Schabelskis' claims here arise directly from injuries as a result of negligence with respect to chairlift operations, loading and riding the chairlift, and chairlift unloading operations. Thus, I would enforce the release and affirm the circuit court's summary judgment order dismissing the Complaint.

¶64 The Schabelskis' Complaint alleged, as relevant:

> Kathleen A. Schabelski[] was attempting to sit down on a *chair* of a *ski lift* prior to *the chair* escalating in height, Mrs. Schabelski became stuck and was unable to secure herself on or in *the chair*; that the plaintiffs *screamed at the ski lift operator*, the defendant, Alex James Fuhrman, to *stop the ski lift* prior to and *while the ski lift* continued to carry Mrs. Schabelski upwards (while she was not properly secured on or *in the chair*), however Mr. Fuhrman *failed to timely stop the lift*, causing the plaintiff, Kathleen A. Schabelski, to fall from a high distance to the ground, sustaining severe personal injuries as hereinafter set forth.

(Emphases added.)

It further alleged:

> That at all times material hereto, the defendant, Alex James Fuhrman, was negligent in that he, among other things, *failed to stop the subject ski lift* in a timely manner; failed to exercise a proper lookout for Mrs. Schabelski *on the ski lift*; failed to have proper management and control of *the ski lift*; and/or otherwise failed to exercise ordinary care for the safety of the plaintiff, Kathleen A. Schabelski, thereby creating a foreseeable risk of harm to her; and was otherwise negligent.

(Emphases added.) These allegations, and all others the Schabelskis make, fall within the terms of the release. The majority opinion identifies the non-covered risk as "rescue operations" and determines that the release is ambiguous as it did not contemplate any negligence with respect to Sunburst's inability to unload (or, as the majority opinion terms it, "rescue") Mrs. Schabelski from the chairlift. I disagree with the majority opinion—regardless of how it identifies the negligent conduct—because the undisputed facts connect any negligent act to the specifically identified

2

risks with respect to the chairlift operations, loading or riding the chairlift, or unloading chairlift operations.[1]

---

[1] The majority opinion says Sunburst's failure to have "a proper plan and proper equipment to evacuate or rescue skiers who are hanging from a lift … is alleged to be a cause of [Mrs. Schabelski's] injuries separate and distinct from any negligence in [Sunburst's] operation of the chairlift." Majority, ¶38. But the Schabelskis never alleged *this* separate negligence in their Complaint. All the negligent acts and all the causes alleged in the Complaint describe chairlift operations, riding, loading, and unloading operations. Negligence based on or caused by "rescue operations" is absent from the Complaint. The other summary judgment materials reaffirm that Mrs. Schabelski's injury, which forms the basis of her Complaint, stemmed from her use of the chairlift and overall chairlift operations, all of which were covered under the release. Mrs. Schabelski attributed her injury to a "misload" of the chairlift followed by Sunburst's failure to stop the lift sooner, which resulted in her slipping off the chairlift. Mr. Schabelski identified several allegedly negligent acts, including an inattentive chairlift attendant, failure to stop the chairlift sooner, and failure to have a response plan "once we got into that situation," and "almost no first aid availability. No ski patrol[.]" Even if the Schabelskis have alleged a claim that could be construed as "negligent rescue," the dispositive question is whether that unambiguously falls within the terms of the release. Based on the undisputed facts here and the release language, I conclude that all of the alleged claims were covered by the release. The Complaint identifies the parties in the first six paragraphs. Then, the "GENERAL ALLEGATIONS" section provides:

> 8. That on February 28, 2016, the plaintiff, Kathleen A. Schabelski and her husband Jay, were skiing at Sunburst Winter Sports Park in Kewaskum, Wisconsin; that as the plaintiff, Kathleen A. Schabelski, was attempting to sit down on a chair of a ski lift prior to the chair escalating in height, Mrs. Schabelski became stuck and was unable to secure herself on or in the chair; that the plaintiffs screamed at the ski lift operator, the defendant, Alex James Fuhrman, to stop the ski lift prior to and while the ski lift continued to carry Mrs. Schabelski upwards (while she was not properly secured on or in the chair), however Mr. Fuhrman failed to timely stop the lift, causing the plaintiff, Kathleen A. Schabelski, to fall from a high distance to the ground, sustaining severe personal injuries as hereinafter set forth.

> 9. That as a result of the described incident and the negligence of the defendant, Alex James Fuhrman, as hereinafter alleged, the plaintiff, Kathleen A. Schabelski, sustained permanent injuries and damages including past and future pain, suffering, disability, and loss of enjoyment of life; past and future medical expenses; and other compensable injuries and damages, all to her damage in an amount to be determined at a trial of this matter.

3

¶65    The Schabelskis sued Sunburst for alleged negligence with respect to the risks specifically covered and contemplated by the release. They acknowledged in the release that they understood that snowboarding "involves risks, dangers, and hazards that may cause serious personal injury or death and that injuries are a common and ordinary occurrence," and these "[r]isks include, but are not limited to … lift equipment and towers, the operation of chairlifts, and chairlift loading, riding, and unloading operations."

---

Next, the Complaint's first claim of negligence alleges:

> 11. That at all times material hereto, the defendant, Alex James Fuhrman, was negligent in that he, among other things, failed to stop the subject ski lift in a timely manner; failed to exercise a proper lookout for Mrs. Schabelski on the ski lift; failed to have proper management and control of the ski lift; and/or otherwise failed to exercise ordinary care for the safety of the plaintiff, Kathleen A. Schabelski, thereby creating a foreseeable risk of harm to her; and was otherwise negligent.
>
> 12. That the negligence of the defendant, Alex James Fuhrman, as alleged, was a cause of the injuries and damages sustained by the plaintiffs as set forth herein.

Then, the Complaint's second claim of vicarious liability alleges:

> 14. That on information and belief, at all times material hereto, the defendant, Alex James Fuhrman, was an employee/agent of the defendant, Friedl Ski Ventures d/b/a Sunburst, and was operating the subject ski lift while in the scope of his employment/agency with said defendant.
>
> 15. That the defendant, Friedl Ski Ventures d/b/a Sunburst, is vicariously liable for the negligent acts of the defendant, Alex James Fuhrman, as alleged above.

The third claim simply alleged loss of society, companionship, and consortium for Mr. Schabelski and contains no other substantive allegations. All of the alleged negligent acts, even including those presented in opposition to summary judgment, are "with respect to" the chairlift operations, loading, riding, or unloading operations and are therefore covered by the release.

¶66 The Schabelskis agreed to release Sunburst "from any liability resulting from any personal injury to" either of them for all negligence "with respect to:" "the operation of chairlifts, and chairlift loading, riding, and unloading operations, including the presence or absence of restraint bars on the chairs." In my view, based on the undisputed facts in the record, this covers injuries caused by any negligence with respect to what the majority opinion terms "rescue operations." Describing the act of getting Mrs. Schabelski off the chairlift (after she had Sunburst stop it due to the misload) as a "rescue" does not remove the act from what was released. If Sunburst had been negligent in "rescuing" Mrs. Schabelski from some act unrelated to the operation of the chairlift, loading, riding, or unloading operations, this might be a different case.[2] For example, if Mrs. Schabelski had slipped off the side of the hill down into a ravine, and while Sunburst was hoisting her out, the hoist broke her leg or her back—or dropped her—that could be a negligent "rescue operation" not related to "the operation of chairlifts, and chairlift loading, riding, and unloading operations." That could be an act that was *not* contemplated or covered by the release. But, the negligent "rescue" involved here was covered because it was with respect to chairlift operations/loading/riding/unloading operations. Thus, the release "clearly, unambiguously, and unmistakably" informed the Schabelskis that by signing, they released Sunburst from injuries Mrs. Schabelski suffered that were caused by Sunburst's negligent acts in attempting to unload her from the chairlift while she was riding it after she initially misloaded and then had the Sunburst attendant stop the chairlift. Sunburst's inability to promptly assist Mrs. Schabelski off of the

---

[2] This is dependent, of course, on whether the release otherwise applied.

chairlift before she slipped is conduct contemplated by the specific terms of the release.

¶67    The majority opinion relies on *Arnold v. Shawano County Agricultural Society*, 111 Wis. 2d 203, 330 N.W.2d 773 (1983), *overruled on other grounds by Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 401 N.W.2d 816 (1987), and adopts that case's "rescue operations" language.  But *Arnold* is distinguishable and does not control because the facts and release in *Arnold* are different than the facts in this case, and the Sunburst release is completely different (as even the majority opinion acknowledges in ¶34).  The *Arnold* release used broad and general language and could "bar only those claims that are within the contemplation of the parties when the contract was executed." *Arnold*, 111 Wis. 2d at 211.  The *Arnold* court agreed that *it would be* "reasonable to assume that this exculpatory contract was intended to preclude liability for such things as negligent maintenance of the track or the negligent driving of another driver participant," but the broad, general language in the release created ambiguity "as to whether the risk of negligent rescue operations was within the contemplation of the parties at the time the exculpatory contract was executed." *Id.* at 212.

¶68    *Arnold* explained the factual circumstances in that case:

> The injuries were sustained by Leroy J. Arnold while participating in a stock car race at the Shawano county fair grounds.  The car operated by Leroy J. Arnold crashed through a guardrail, left the track, and then struck a utility pole and a lumber pile located outside of the guardrail causing a fire in the automobile.  As a part of the rescue operations, fire extinguishing chemicals were sprayed on the burning vehicle without removing Leroy Arnold from the vehicle.  The chemicals allegedly caused the plaintiff to sustain severe brain damage.

6

*Id.* at 204. The supreme court concluded a jury should decide whether the parties intended to release the injuries arising from those facts. *Id.* at 212.

¶69    Here, the release is not broad or general—it is quite specific. It specifically informs the Schabelskis that they are releasing Sunburst from *any* claims with respect to chairlift operations, loading and unloading operations,[3] or riding, and importantly it does not distinguish between the Schabelskis' own acts and the acts of others in regard to those activities. Unlike in *Arnold*—where one may not expect a broad release for stock car racing to also release a claim where one suffers brain damage after being sprayed with fire-extinguishing chemicals—a negligence claim against Sunburst for injuries Mrs. Schabelski suffered after slipping off a chairlift is exactly the type of claim contemplated by the specific language of the Sunburst release. The ambiguity in the *Arnold* release does not exist here. There is no ambiguity, and there are no disputed issues of fact as to whether negligence from operation of the chairlift—which led to Mrs. Schabelski slipping off of it after misloading and while riding it or waiting for unloading operations—were within the contemplation of the parties when the Schabelskis executed the contract. A proper application of *Arnold* would actually support my position because the *Arnold* court concluded that it *is* "reasonable to assume that this exculpatory contract was intended to preclude liability for such things" that are inherent dangers ordinarily expected from the activity involved. *See Arnold*, 111 Wis. 2d at 212.

---

[3] Although the release includes "unloading *operations*"—not just "unloading"—the majority opinion defines only "unloading" rather than "unloading operations." In addition, its attempt to distinguish chairlift operations from chairlift evacuation is immaterial. Even if chairlift *evacuation* could be carved out from chairlift *operations* and unloading *operations*, the Sunburst owner's uncontroverted deposition testimony shows that evacuation occurred only when the chairlift was not operational, which was not the case here.

7

¶70    In this case, the activity involves a chairlift at a ski hill.  The American National Standards Institute (ANSI) safety standards state that "[a]ll passengers who use an aerial lift shall be responsible for their own embarkation, riding and disembarkation.  They shall be presumed to have sufficient ability, physical dexterity, and/or personal assistance to negotiate and to be evacuated from the aerial lift safely."  AMERICAN NAT'L STANDARD FOR PASSENGER ROPEWAYS—AERIAL TRAMWAYS, AERIAL LIFTS, SURFACE LIFTS, TOWS & CONVEYORS—SAFETY REQUIREMENTS, ANSI B77.1-2011, § 4.3.6.2 (AM. NAT'L STANDARDS INST. 2011).  These safety standards also provide:  "It is recognized that certain dangers and risks are inherent in machines of this type [chairlifts], and their operation.  It is also recognized that inherent and other risks or dangers exist for those who are in the process of embarking, riding or disembarking from fixed grip aerial lifts….  Passengers accept the risks inherent in such participation of which the ordinary prudent person is or should be aware."  *Id.*, § 4.3.6.1.  Thus, when signing a release that specifically says the person will release Sunburst for all negligence with respect to chairlifts, it is reasonable to conclude Sunburst's inability to unload Mrs. Schabelski from the chairlift before she slipped off of the chairlift was an act contemplated by the release.

¶71    Chairlifts, as recognized by ANSI, are an inherently dangerous but ordinary and expected risk of the sport involved here.  People misload them and fall off.  People ride them and fall off.  People slip off when the chairlift stops and, as shown here, people slip off while waiting to be unloaded.  These circumstances are no doubt sad and tragic.  I am sure all parties, if given a chance, would have done things differently to avoid the injuries that befell Mrs. Schabelski.  But, based on these facts and the law, I cannot join the majority opinion in latching on to "rescue operations" to avoid the effect of the release.  The Schabelskis signed a release that

8

plainly contemplated releasing Sunburst for injuries caused by negligence with respect to chairlift operations, riding, loading, and unloading operations. The Schabelskis contracted away their right to file suit against Sunburst for its negligence with respect to the chairlift. They had the option to pay an extra $10 fee to retain that right, but they did not choose that option. There is no ambiguity as to what the parties contemplated.

¶72 I would affirm the circuit court's order and enforce the release as to the entirety of the Schabelskis' claims. I respectfully concur in part and dissent in part.